**In re BLUE DIAMOND COAL COMPANY, Debtor.**

**Bankruptcy No. 91–32611.**

United States Bankruptcy Court, E.D. Tennessee.

Aug. 30, 1991.

Hodges, Doughty & Carson, Thomas H. Dickenson, Arnett, Draper & Hagood, Lewis R. Hagood, Knoxville, Tenn., for debtor.

Segal, Isenberg, Sales, Stewart & Cutler, Irwin H. Cutler, Jr., Adrienne A. Berry, Louisville, Ky., Baker, Worthington, Crossley, Stansberry & Woolf, James A. McIntosh, Knoxville, Tenn., for Southern Labor Union, Local No. 188.

Melnick & Moore, Neal S. Melnick, Knoxville, Tenn., for Committee of Equity Sec. Holders.

Gentry, Tipton, Kizer & Little, P.C., W. Morris Kizer, Knoxville, Tenn., for Committee of Unsecured Creditors.

## MEMORANDUM ON DEBTOR'S APPLICATION TO REJECT COLLECTIVE BARGAINING AGREEMENT

RICHARD S. STAIR, Jr., Bankruptcy Judge.

The court has before it the debtor's "Application To Reject Collective Bargaining Agreement" (Application) filed July 17, 1991. By its Application the debtor seeks authorization to reject a collective bargaining agreement (Contract) with the Southern Labor Union, Local No. 188 (the Union), entered into on May 14, 1990. The Contract, with an effective date of May 5, 1990, expires May 5, 1993. The Union filed a written response in opposition to the Application on July 29, 1991.

The record before the court consists of exhibits and testimony introduced at the hearing on the Application held August 5, 6 and 15, 1991. Additionally, the parties stipulate the admissibility of all testimony and exhibits introduced at hearings held May 31, June 10, and July 8 and 25, 1991, in conjunction with motions filed by the debtor pursuant to 11 U.S.C.A. § 1113(e) (West Supp.1991) requesting interim changes to the Contract. Interim relief granted the debtor expires August 31, 1991, thus necessitating a ruling on the Application in advance of the thirty days mandated by § 1113(d)(2). On August 5, 1991, prior to commencement of the hearing on the Application, the parties filed a consolidated Statement Of Issues and Stipulations.

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(A) (West Supp.1991).

I

Essential to a resolution of the issues before the court is a discussion of the facts, pre-petition and post-petition, which gave rise to the filing of the debtor's Chapter 11 petition and its Application.

The debtor is engaged in the business of deep-mining coal which it sells principally under long-term contracts to Georgia Power Company and Orlando Utilities Commission. Most of the properties on which the debtor mines its coal are leased from an

entity by the name of Kentucky River Coal Corporation. At the time it filed its Chapter 11 petition, the debtor's operations were concentrated exclusively at its Leatherwood mine complex in Eastern Kentucky. In addition to coal produced from its mining operations, the debtor, subject to limitations imposed upon it under the Contract, also purchases coal mined from its reserves by independent contractors, hereinafter referred to as contract miners.

The Southern Labor Union has been the exclusive bargaining agent for employees of the debtor working in or about the mines for many years. At the time the debtor filed its Chapter 11 petition, approximately 272 bargaining unit employees were actively working inside or outside the mines. In addition to its Union employees, the debtor, at the time its petition was filed, also employed a total of approximately 114 non-Union personnel at its Leatherwood complex and at its corporate offices in Knoxville and outlying areas.

Under the terms of the Contract, the bargaining unit employees each work four consecutive ten-hour days. There are two groups of employees, each of which works an alternate four-day work week and has four days off. Each employee works 180 days per year: the combined labor force works 360 days per year. All employees receive overtime beyond eight hours per day or forty hours per week at time and a half. Thus, each employee working a normal forty-hour week receives thirty-two hours pay at straight time and eight hours at premium time, *i.e.*, time and a half.

Effective May 5, 1991, each employee received a daily wage increase of $5.00 per eight-hour day. The rate for the highest classified employees, Continuous Miner Operators, First–Class Mechanics, Electricians and Roof Bolters, increased from $116 per eight-hour day to $121 per eight-hour day. The daily wage rate for entry level personnel, the lowest classified employees, increased from $102 per eight-hour day to $107 per eight-hour day. Giving effect to the two hours overtime pay received by each employee on a daily basis, the true wages of the highest classified employees increased on May 5, 1991, from $159.50 per ten-hour day to $166.37 per ten-hour day. Prior to May 5, 1991, an entry level employee received a wage of $140.25 per ten-hour day which on May 5, 1991, increased to $147.12 per ten-hour day.

It is clear from the record before the court that the coal industry in Central Appalachia, and particularly in Eastern Kentucky, is severely depressed. Gordon Bonnyman, a shareholder and chairman of the debtor's Board of Directors, testified that he was associated with the debtor on a full-time basis from 1945 through 1984; that he headed the debtor from 1953 until 1984; that current coal prices are low; that a number of mines are closing, have cut back on operations, or are in bankruptcy; that he has never experienced as depressed a coal market as pervades Eastern Kentucky at this time; and that if the debtor is to survive under present market conditions, it must reduce its costs by several dollars a ton. In hearings held on the debtor's motions for interim relief under § 1113(e) and on its Application, the court has heard no testimony to refute Mr. Bonnyman's analysis of the present state of the coal industry in Eastern Kentucky.

From its 1983 fiscal year ending March 31, 1984, through its 1990 fiscal year ending March 31, 1991, the debtor has seen production costs at its Leatherwood operations drop approximately eight and one-half (8½%) percent from $41.28 during fiscal year 1983 to $37.74 during fiscal year 1990. During this same time period, the price the debtor has realized from the sale of its coal decreased approximately thirty-two and one-half (32½%) percent from a high of $45.24 per ton during fiscal year 1983 to $30.16 per ton during fiscal year 1990.

The debtor has not realized a profit from its mining operations since fiscal year 1986 at which time it realized $.95 per ton of coal produced. During its 1990 fiscal year, the debtor sustained a loss from the operation of its Leatherwood mines totalling $9,945,285. During fiscal year 1990, the debtor produced 1,247,318 tons of coal at a cost of $37.74 per ton from which it realized $30.16 per ton. It thus lost $7.58 per

ton of coal produced. The labor associated with its $37.74 per ton production cost during fiscal year 1990, inclusive of union and non-Union labor, totalled $17.91 per hour, or approximately forty-seven and one-half (47½%) percent of the cost of each ton of coal produced. During April, 1991, the debtor lost another $1,083,915 on 115,129 tons of coal produced. Its production costs during April totalled $38.63 per ton from which it realized $29.22 per ton. Thus, the debtor's loss escalated to $9.41 per ton in April. This scenario continued through May, 1991, during which the debtor lost $1,066,249 on 102,632 tons of coal produced. Its productivity decreased during May thereby increasing production costs to $44.01 per ton from which it realized $33.63. Thus, during May the debtor sustained a loss of $10.38 per ton. The record further establishes that production dropped from an average of 3,832 tons per day from April 1 through May 17, 1991, the date the debtor filed its Chapter 11 petition, to an average of 2,821 tons per day from May 18 through 31, 1991, and further dropped to an average of 2,211 tons per day from June 1 through 6, 1991. The undisputed testimony of the debtor's president, Ted Helms, is that this drop in production of approxi-mately 1,600 tons per day increased the debtor's losses by $30,000 per day.

While the debtor's coal production operations have been unprofitable since 1986, the converse is true regarding coal purchased directly from contract miners within limitations imposed under the Contract.[1] During fiscal year 1990, the debtor purchased 401,-312 tons of coal from contract miners at a cost of $26.71 per ton from which it realized $28.41 per ton.[2] The debtor thus realized a profit of $1.70 per ton for a total profit of $679,864 during fiscal year 1990. During April, 1991, the debtor purchased 69,963 tons of coal from contract miners at a cost of $27.17 per ton from which it realized $29.12 per ton for a profit of $1.95 per ton or a total profit of $135,159. During May, 1991, the debtor purchased 78,978 tons of coal from contract miners at a cost of $25.56 per ton from which it realized $30.48 per ton for a profit of $4.92 per ton or a total profit of $388,656.

The following chart contrasts the debtor's cost to produce a ton of coal at its Leatherwood complex with its cost to produce a ton of coal purchased from contract miners for fiscal years 1985 through 1990:[3]

| FISCAL YEAR ENDING | PRODUCTION COST LEATHERWOOD | PRODUCTION COST CONTRACT MINERS | DIFFERENCE |
|---|---|---|---|
| 03/31/91 | $37.74 | $26.71 | $11.03 |
| 03/31/90 | 32.90 | 24.32 | 8.58 |
| 03/31/89 | 36.19 | 28.30 | 7.89 |
| 03/31/88 | 38.02 | 25.28 | 12.74 |
| 03/31/87 | 35.39 | 25.46 | 9.93 |
| 03/31/86 | 35.37 | 26.75 | 8.62 |
| AVERAGE | $35.94 | $26.14 | $ 9.80 |

1. The Contract allows the debtor to purchase coal from contract miners in varying amounts so long as the active work force exceeds 210 bargaining unit employees. Specifically, during the second and third years of the Contract the debtor is permitted to purchase coal on a daily basis as follows: less than 210 employees—0 tons; 211 to 225 employees—5 tons per active employee; 226 to 250 employees—10 tons per active employee; 251 to 300 employees—20 tons per active employee; 301 to 344 employees—30 tons per active employee; more than 344 employees—no restrictions.

2. The debtor's cost consists of a contract price paid the contract miners, which during fiscal year 1990 approximated $20.03 per ton, plus the debtor's preparation costs, including labor and supplies, and royalties. During April and May, 1991, the debtor paid a contract price approximating $20.81 and $19.53 per ton, respectively, to contract miners.

3. Coal purchased from contract miners is "produced" by the debtor in the sense that prior to sale it must go through the debtor's preparation plant.

Prior to filing its Chapter 11 petition, representatives of the debtor met four or five times with Union representatives to discuss the debtor's financial condition. The Union was requested to forego the $5.00 daily wage increase scheduled to go into effect May 5, 1991, and to reduce other benefits and costs. The Union refused to negotiate any concessions to the May 5, 1990 Contract.

Simultaneous with the filing of its Chapter 11 petition on May 17, 1991, the debtor filed a motion requesting that it be authorized to implement interim changes in its Contract pursuant to Bankruptcy Code § 1113(e). A hearing on the debtor's motion for interim relief was held May 31, 1991. At the conclusion of the hearing, the court granted interim changes in the Contract for a ninety-day period. These changes are summarized as follows:

1) Health care benefits were modified to provide bargaining unit employees with the same plan as salaried employees. The annual savings attributable to this interim relief is projected at $163,200.

2) Payments to the Union's pension fund amounting to $.30 per ton of coal mined were suspended. The annual savings attributable to this interim relief is projected at $646,080.

3) Daily overtime relative to the ten-hour per day shifts worked by bargaining unit employees was eliminated. The wage and hour provisions of the Contract were modified to permit overtime only for work in excess of forty hours per week. The annual savings attributable to this interim relief is projected at $785,093.

4) Payment by the debtor of holiday work at overtime rather than straight time was eliminated as were three of the bargaining unit employees' eight paid holidays, Labor Day, the day after Thanksgiving, and Memorial Day. The annual savings to the debtor attributable to this interim relief is projected at $126,600.

5) All vacation pay is to be paid at straight time resulting in an annual projected savings of $93,263.36.

6) Daily wage rates paid bargaining unit employees were temporarily revised to cap the highest paid employee at $121 per ten-hour day with a corresponding cap on all other wage classifications. The annual savings attributable to this interim relief is projected at $2,401,862.

7) Elimination of a paid personal day for each bargaining unit employee at an annual savings projected at $33,760.

As a result of the interim relief granted under its May 17, 1991 motion, annual savings to the debtor are projected at $4,156,-595.[4] This equates to a projected monthly savings of $346,383.

In addition to the interim relief granted the debtor on May 31, 1991, the court directed the debtor's non-bargaining unit employees to take a mandatory fifteen (15%) percent wage reduction effective May 1, 1991. The annual savings to the debtor as a result of this mandatory salary reduction is projected at $540,918.

The interim relief granted on May 31, 1991, is projected to give the debtor a cost savings of $3.47 per ton of coal produced based on an annual projection of 1,353,600 tons. Of this amount, $3.07 is realized through the modifications to the May 5, 1990 Contract; $.40 is realized through the court ordered salary reductions for non-Union personnel. Accordingly, notwithstanding the May 31, 1991 interim relief, the debtor's projected losses based upon fiscal year 1990 production will not be eliminated, but will merely be reduced from $7.58 per ton of coal produced to $4.11 per ton. Other cost saving measures potentially available to the debtor, including negotiating reductions in haulage costs and royalty payments, would not serve to significantly further reduce its per ton losses.

On June 6, 1991, the debtor filed a second motion for interim relief under

4. Item 5 is not included in this computation as vacation pay savings are factored into calcula-tions under Items 3 and 6.

§ 1113(e) requesting that it be permitted to implement additional temporary modifications to the Contract. By this motion the debtor sought to temporarily eliminate those restrictions inhibiting its ability to purchase coal from contract miners.[5] Subsequent to a hearing held June 10, 1991, the court granted this interim relief for a 30–day period. The debtor subsequently laid off a substantial number of employees at its Leatherwood mines including all but twelve bargaining unit employees and began acquiring all of its coal from contract miners.[6] The only bargaining unit employees retained were those essential to operate the preparation plant and to remove equipment from the mines. The debtor has ceased production and is relying on coal purchased from contract miners to meet its contractual commitments. The court, upon subsequent motions filed by the debtor, found it necessary to extend the interim relief granted June 10, 1991, through August 31, 1991. This decision was, in part, attributable to the debtor's inability to obtain workers compensation insurance.

The debtor, a self-insured employer under Kentucky's workers compensation laws, informed members of Kentucky's Workers Compensation Board (the Board) in a meeting held June 10, 1991, of the filing of its Chapter 11 petition and its inability to pay bills on outstanding awards or claims being made on workers compensation matters. Subsequent to this meeting, the Board determined that it should call in a $10.6 million letter of credit payable to the Board for the debtor's benefit by First American National Bank of Knoxville. By letter to the debtor's Personnel Director, Allen R. Blevins, dated June 10, 1991, the Board notified the debtor that its self-insurance privileges were revoked. Thus, the debtor and bargaining unit employees were without the benefit of workers compensation coverage. Having lost its self-insured status, the debtor, if it was to operate in compliance with Kentucky law, was required to procure workers compensation insurance either in the private market or through the assigned-risk pool. The debtor endeavored unsuccessfully to obtain the necessary coverage for its work force through the private market. Ultimately, for an annual premium of $293,860.15, the debtor was able to obtain workers compensation coverage through the assigned-risk pool for thirty mining and five clerical employees. The court concludes from the testimony of William J. Smiley, Jr., president of the Knoxville operations of Flattop Insurance Agency, the agency which has handled the debtor's insurance account during the past five years, that the debtor is unable to obtain workers compensation insurance from the private market. The court further concludes from Mr. Smiley's testimony that the likelihood that the debtor can obtain workers compensation coverage from the assigned-risk pool for its entire work force is remote. Were such coverage available, Mr. Smiley testified that the annual premium based on approximately 360 mining employees and five clerical employees with an average annual payroll of $12,010,547 would approximate $4,451,842.[7] This annual premium would, presumably, be lessened proportionately by a smaller number of employees and reduced payroll.

During the 1990 fiscal year ending March 31, 1991, workers compensation costs at the debtor's Leatherwood operations totalled $2,833,573 or $2.27 per ton of coal produced.[8] The projected cost of workers compensation insurance, $4,451,842, if available, would result in an estimated cost of $3.29 per ton assuming the debt-

---

**5.** *See supra* n. 1.

**6.** The record does not establish the number of non-Union mining personnel laid off at the Leatherwood operations.

**7.** The debtor's mining employees consist not only of its bargaining unit employees but also of a substantial number of non-Union employees, including section foremen, maintenance, prepa-

ration, shop, and warehouse personnel, and guards.

**8.** The debtor's Exhibit 45 incorrectly states the cost of workers compensation coverage at $2.10 per ton based upon 1,347,861 tons mined in fiscal year 1990. The record establishes that the debtor mined 1,247,318 tons during 1990. (Exhibit 13).

or produced a projected 1,353,600 tons of coal in fiscal year 1991.

The May 5, 1990 Contract requires the debtor to provide bargaining unit employees with workers compensation coverage. Further, the debtor's major leases, from which it derives its ability to mine coal at its Leatherwood complex, also require it to maintain workers compensation coverage on its employees.

The debtor contends that its inability to obtain workers compensation insurance coverage, the depressed coal market in Eastern Kentucky, its high cost of production attributable in large part to high labor costs, and its inability to reverse its losses over the past several years, compel it to discontinue its deep mining operations and to honor its utilities contracts through coal purchased from contract miners. The debtor asserts that its reorganization prospects are wholly dependent upon its ability to restructure its operations around its acquisition of coal from contract miners. If it is limited in its ability to acquire coal in this manner, the debtor contends it will be unable to reorganize and will be required to liquidate. Liquidation, should it occur, might optimistically result in a dividend to unsecured creditors approximating seven (7%) percent.[9]

In support of the debtor's contention that it must shift the focus of its operations from coal it produces to coal mined by contract miners, the debtor called an expert witness, Seth Schwartz. Mr. Schwartz, a geological engineer, is part owner of Energy Ventures Analysis, Inc., an entity performing consulting work in economic, environmental, and energy areas. Mr. Schwartz' expertise since 1980 has been in the coal and utility industry. The record establishes Mr. Schwartz' credentials as an expert witness in the area of coal production and productivity in the Appalachian area.

In August, 1988, Mr. Schwartz, through Energy Ventures Analysis, Inc., published a report on the production and productivity of mining complexes in the Appalachian area. That study was updated through 1990 for purposes of the hearing on the debtor's Application. This report establishes the following: (1) that in 1987 contract miners in Kentucky conservatively produced twenty-eight (28%) percent of the total production at deep mining complexes; (2) that into the 1990s the total coal produced in Eastern Kentucky by contract miners has increased to thirty-five to forty (35—40%) percent and continues to increase; (3) that labor production costs are higher in company operated mines; (4) that contract miners are more productive than company-operated deep mines by ten to thirty (10—30%) percent; (5) that during 1987 the average production for a company-operated deep mine in Eastern Kentucky was 2.32 tons per manhour worked versus 2.54 tons per manhour worked for coal produced by contract miners; (6) that during 1990, the average production for a company-operated deep mine in Eastern Kentucky was 2.75 tons per manhour worked versus 3.00 tons per manhour worked for coal produced by contract miners; and (7) that during 1990 the debtor's mine productivity was 1.63 tons per manhour worked, an amount substantially below the average for other company-operated mines in Eastern Kentucky.

Mr. Schwartz also did a study establishing that in Eastern Kentucky the cost to produce a ton of coal mined is greater in low-productivity companies. For example, his study showed that the cost to produce 1.50 clean tons of coal per manhour worked approximates $36.70 per ton while the cost to produce 4.00 clean tons per manhour

---

**9.** The debtor's liquidation analysis evidences assets, inclusive of utilities contracts, with a value approximating $32,890,000; debt totalling $35,500,000, which is secured by all assets except a Georgia Pacific lease valued at an estimated $1,354,000; and unsecured claims, liquidated, contingent, and disputed, estimated at $15,942,000. Assigning the undersecured portion of the debtor's secured debt an unsecured status provides the debtor with general unsecured claims estimated at $19,906,000. Cash collateral orders entered by the court directing that the unencumbered Georgia Pacific lease stand as additional collateral to secure any deficit in an $8,000,000 "Borrowing Base" secured by designated "Borrowing Base Assets" could serve to dilute or eliminate the unencumbered value of this asset. Whether unsecured creditors would, in fact, realize anything upon liquidation is clearly speculative.

worked approximates $21.80 per ton. The debtor, with a mine productivity during 1990 of 1.63 clean tons per manhour worked, is on the low-productivity end of Mr. Schwartz' schedule for deep-mine operators in Eastern Kentucky.

## II

The parties have exchanged numerous proposals and counter-proposals regarding modifications to the May 5, 1990 Contract. The debtor made its initial proposal to representatives of the Union as required under § 1113(b)(1) on the day it filed its Chapter 11 petition, May 17, 1991. Other written proposals and counter-proposals were made by the debtor on July 10, 17, and 22, 1991. Written proposals and counter-proposals were made by the Union to representatives of the debtor on June 27, July 15, and August 12, 1991.[10] Bargaining sessions were held May 17 and 22, June 9, 19, and 26, July 10, 15, 17 and 22, 1991. Additionally, the debtor responded in writing to the Union's August 12, 1991 counter-proposal on August 13, 1991. A mediator was present at bargaining sessions held June 26 and July 10, 15, 17 and 22, 1991. The parties have spent many hours subsequent to the commencement of the debtor's bankruptcy case in bargaining sessions.

The debtor and Union are in substantial agreement over a number of economic issues. The failure of the parties to finally negotiate modifications to the May 5, 1990 Contract is attributable to their inability to resolve issues surrounding the debtor's use of contract miners. In substance, the debtor in its final proposal of July 22, 1991, proposes an unlimited use of contract miners and that it will "undertake to require that Lessees or Contract Miners ... hire 35% of the Lessee's or Contract Miner's production employees from a list of employees furnished to them by the ... [debtor]." [11] The Union's response to the debtor's proposal regarding its unlimited use of contract miners has remained relatively unchanged from its initial counter-proposal of June 27, 1991, through its final proposal of August 12, 1991. Material provisions of the Union's June 27, 1991 proposal are as follows:

2. Any ... [Contract miner] would be required to hire its entire non-supervisory work force from the panel of laid off Blue Diamond employees under the terms of the 1990–93 collective bargaining agreement, without the need for physical examinations.

3. Any such contractor would agree to adopt and become a party to the 1990–93 collective bargaining agreement and credit all employees with seniority which they have with Blue Diamond.

The August 12, 1991 Union proposal finalizes the Union's position regarding the debtor's use of contract miners as follows:

2. As long as the ... [debtor] provids [sic] 200 jobs they can bring in an unlimited amount of outside coal with no minimums. [Contract miners] ... and the company will recognize the contract to count toward the 200 jobs. [Contract miners] ... must also hire 100% of their work force from our cut off panel. [Contract miners] ... exempt from this are Switch Energy, Bud Cornett, and Nally [and] Hamilton.[12] Future mines on Cornettsville and Fusonia property are also exempt.

In sum, the debtor has consistently maintained that it cannot survive unless it terminates production and purchases coal ex-

10. The final Union proposal was made subsequent to commencement of the hearing on the debtor's Application and was admitted into evidence over the debtor's objection. The court rejected an argument of debtor's counsel that language in § 1113(b)(2) providing that the collective bargaining process required under § 1113(b)(1) shall "end ... on the date of the hearing ... [on the application for rejection]" precluded admission into evidence of the Union's August 12, 1991 counter-proposal.

11. The July 22, 1991 proposal is extensive, focusing on all bargaining issues. The court addresses only the issue of the debtor's use of contract miners as this is the fundamental issue which precluded the parties from reaching an agreement.

12. Switch Energy, Bud Cornett, and Nally and Hamilton are contract miners from whom the debtor is presently purchasing coal.

clusively from contract miners.[13] The Union insists that if the May 5, 1990 Contract is to be modified to permit an unlimited use of contract miners by the debtor, the debtor must agree that it will require the contract miners to hire their entire work force from laid off bargaining unit employees, and that each contract miner must become a party to the May 5, 1990 Contract.

The debtor argues that the Union proposals have been and remain totally unworkable in that the debtor cannot impose the May 5, 1990 Contract on third-party contract miners and, further, that the cost efficiencies of contract-mined coal would be eliminated. Further, the debtor contends the Union proposals potentially or actually constitute unfair labor practices prohibited under the National Labor Relations Act (NLRA).

### III

The rejection of a collective bargaining agreement by a Chapter 11 debtor is governed by § 1113 of the Bankruptcy Code. This section, entitled *Rejection of collective bargaining agreements*, provides in material part:

> (a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.
>
> (b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—
>
> (A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those nec-essary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and
>
> (B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.
>
> (2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.
>
> (c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—
>
> (1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);
>
> (2) the authorized representative of the employees has refused to accept such proposal without good cause; and
>
> (3) the balance of the equities clearly favors rejection of such agreement.

11 U.S.C.A. § 1113 (West Supp.1991).

In sum, § 1113 at subsection (a) provides for assumption or rejection of a collective bargaining agreement "only in accordance with the provisions of this section." Subsection (b) requires the debtor in possession to make a proposal to the Union providing for employee benefit modifications that are necessary to permit the debtor's reorganization and to assure that all creditors, the debtor, and all other affected parties are treated fairly. Subsection (b) further requires the debtor to provide the Union with information necessary to evaluate the proposal and requires meetings between the debtor and the Union. Subsection (c) provides that the court shall approve the Ap-

---

**13.** The record indicates that the debtor occasionally purchases an insignificant quantity of coal from third parties for direct shipment in support of its contract obligations.

plication if it finds the debtor has made a proposal that fulfills the requirements of subsection (b); that the Union has refused to accept the proposal without good cause; and that the balance of the equities favor rejection of the collective bargaining agreement. *United Steelworkers of America v. Unimet Corp. (In re Unimet Corp.),* 842 F.2d 879, 882 (6th Cir.1988), *cert. denied,* 488 U.S. 828, 109 S.Ct. 81, 102 L.Ed.2d 57 (1988). Subsections (d), (e), and (f) of § 1113 are not material to the issues presently before the court.

The Sixth Circuit has not had occasion to address § 1113 other than peripherally. Its sole excursion into § 1113 appears to be in *Unimet,* cited *supra,* in which it held that § 1113 had application to retirees covered by provisions in the debtor's collective bargaining agreement with United Steel Workers of America. Bankruptcy courts within the Sixth Circuit have, however, had opportunity to address motions by debtors to reject collective bargaining agreements. *See, e.g., In re Amherst Sparkle Market, Inc.,* 75 B.R. 847 (Bankr.N.D. Ohio 1987); *In re Walway Co.,* 69 B.R. 967 (Bankr. E.D.Mich.1987); *In re Kentucky Truck Sales, Inc.,* 52 B.R. 797 (Bankr.W.D.Ky. 1985); *In re Allied Delivery System Co.,* 49 B.R. 700 (Bankr.N.D.Ohio 1985). These courts, with some uniformity, have examined debtors' applications to reject collective bargaining agreements within a nine-part test formulated in the case of *In re American Provision Co.,* 44 B.R. 907 (Bankr.D.Minn.1984), by Bankruptcy Judge Robert J. Kressel in the first reported opinion after enactment of § 1113 as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984. Judge Kressel states these nine factors as follows: [14]

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

44 B.R. at 909.

Regarding each of the above tests, the burden of proof is to be borne by the debtor with a preponderance of the evidence. The burden of going forward with the evidence can, however, shift to the union, particularly with respect to tests number 5, 7, and 8. *Amherst Sparkle Market,* 75 B.R. at 849; *American Provision Co.,* 44 B.R. at 909. *See Walway,* 69 B.R. at 975.

■ The issues and stipulations numerically identified by the parties in the consolidated Statement Of Issues and Stipulations filed August 5, 1991, are couched in a format suggesting reliance by the debtor and Union on the *American Provision* nine-part test. This conclusion is supported by the attention paid *American Provision* by counsel for each party in briefs filed in support of their respective positions. This court adopts the nine-test format as controlling its analysis of the issues before it.

---

**14.** This test does nothing more than isolate the factors essential to a debtor's rejection of a collective bargaining agreement as mandated by § 1113(b) and (c).

## A

### THE DEBTOR IN POSSESSION MUST MAKE A PROPOSAL TO THE UNION TO MODIFY THE COLLECTIVE BARGAINING AGREEMENT.

The parties, through the "Stipulations" filed August 5, 1991, stipulate the debtor's compliance with this factor.

## B

### THE PROPOSAL MUST BE BASED ON THE MOST COMPLETE AND RELIABLE INFORMATION AVAILABLE AT THE TIME OF THE PROPOSAL.

The parties, through the "Stipulations" filed August 5, 1991, stipulate the debtor's compliance with this factor.

## C

### THE PROPOSED MODIFICATIONS MUST BE NECESSARY TO PERMIT THE REORGANIZATION OF THE DEBTOR.

█ Section 1113 is limited to a debtor's proposal providing for "necessary" modifications to a collective bargaining agreement material to "employees benefits and protections." Negotiations between the debtor and Union have focused, *inter alia*, on modifications to provisions under the May 5, 1990 Contract relative to wages and hours, the Union's welfare fund and pension plan, vacation pay, seniority, and, as has been emphasized, elimination of those limitations imposed upon the debtor inhibiting its ability to purchase coal from contract miners. The Union cannot seriously suggest that the modifications sought by the debtor do not relate to "employees benefits and protections."

The fundamental issue the court is, therefore, called upon to resolve is whether the proposed modifications are "necessary" to permit the debtor's reorganization. There is a divergence of opinion on the meaning of "necessary" under § 1113(b)(1)(A). The Third Circuit in *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America*, 791 F.2d 1074 (3d Cir.1986), narrowly construes the term "necessary" to "signify only modifications that the trustee is constrained to accept because they are directly related to the Company's financial condition and its reorganization." 791 F.2d at 1088. Other courts, including the Second Circuit in *Truck Drivers Local 807 v. Carey Transportation, Inc.*, 816 F.2d 82 (2d Cir.1987), have not so narrowly construed the requirement of "necessary" modifications under § 1113. As observed by the Second Circuit, "the necessity requirement places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully." 816 F.2d at 90. The Second Circuit's analysis has been adopted by the Tenth Circuit in *Sheet Metal Workers' International Assoc., Local 9 v. Mile Hi Metal Systems, Inc. (In re Mile Hi Metal Systems, Inc.)*, 899 F.2d 887 (10th Cir. 1990). The Tenth Circuit observed that the "majority of cases decided since *Wheeling–Pittsburgh* have declined to interpret § 1113(b)(1)(A) as requiring that a proposal be absolutely necessary." 899 F.2d at 892 (citations omitted).

The court, for purposes of the instant proceeding, need not concern itself with the distinctions between the Second Circuit and Tenth Circuit standards. The record clearly establishes that if the debtor is to reorganize it is essential that it be permitted to purchase coal in an unlimited quantity from contract miners.

The debtor's inability to obtain workers compensation insurance coverage, the higher productivity achieved by contract miners, the disparity in costs attributable to purchasing coal from contract miners versus the debtor's excessive production costs, and the established profitability of purchasing coal from contract miners, all serve to establish the debtor's inability to reorganize other than through refocusing its operations on its acquisition of coal from contract miners. The court is persuaded on the record before it that if the Contract is modified to permit the unlimited use of contract miners this debtor's chances of

reorganization and its return to profitability are substantially enhanced. The court is equally persuaded that the cost-saving cuts the debtor has implemented, including those realized from the interim relief granted under § 1113(e), are not sufficient to permit its survival through the continued production of coal.

## D

### THE PROPOSED MODIFICATIONS MUST ASSURE THAT ALL CREDITORS, THE DEBTOR AND ALL OF THE AFFECTED PARTIES ARE TREATED FAIRLY AND EQUITABLY.

 Regarding this test, it has been observed:

It is somewhat difficult for a court to determine, at the time of the hearing on the motion for rejection, whether this test has been met. Given the fact that Congress has mandated that the court hear a motion to reject a collective bargaining agreement within 14 to 21 days after the filing of the motion, and that the court must, by statute, make a determination within 30 days after the commencement of the hearing, Congress obviously could not have intended that the court make findings with respect to the likely treatment of creditors and equity security holders under a plan of reorganization.... Since the court may not be able to determine precisely what the relative sacrifices of creditors, equity security holders, and employees will be under a plan—as, when, and if a plan is confirmed—section 1113(c) should not be read to require the court to do the impossible. Because a section 1113 motion will almost always be filed before an overall reorganization plan can be prepared, the debtor cannot be expected to identify further alterations in its debt structure. A good faith proposal made under section 1113(b) should satisfy section 1113(c) if, on the basis of the facts available at the time of the hearing, the court concludes that the proposal is not patently unfair to the affected employees when compared to the other effects that the chapter 11 case will have on other parties in interest.

5 *Collier on Bankruptcy* ¶ 1113.-01[4][d][ii][C] (15th ed. 1990) (citations omitted).

The court concludes that the proposed modifications accord all affected parties fair and equitable treatment. The fact that the proposed modifications do not necessarily provide for identical treatment with respect to all affected parties, does not necessarily result in unfair or inequitable treatment under § 1113(b)(1)(A). *See Amherst Sparkle Market,* 75 B.R. at 851; *Allied Delivery System,* 49 B.R. at 703. A debtor "is not required to prove, in all instances, that managers and non-union employees will have their salaries and benefits cut to the same degree that union workers' benefits are to be reduced." *Carey Transportation,* 816 F.2d at 90.

Clearly, the debtor's proposal to use contract miners does not provide identical treatment between Union and non-Union employees. However, given the debtor's overall situation and need for survival, such treatment is not inequitable or unfair. Without the flexibility provided by the debtor's right to employ contract miners, as is provided for by the debtor's proposed modification to the Contract, positive cash flow is impossible and liquidation is in all probability inevitable. The debtor's liquidation analysis, which is undisputed in the record, is that the pool of unsecured creditors would be substantially increased by claims associated with its rejection of its mining leases; that secured creditors holding claims approximating $35,500,000 would, in fact, be secured to the extent of approximately $31,536,000, thus increasing the unsecured creditor pool by an additional sum approximating $4,000,000; that, assuming optimum liquidation results, unsecured creditors might receive a dividend approximating seven (7%) percent; and that shareholders would realize nothing. Further, the testimony of Leo Hamilton, a vice president of Nally and Hamilton, a contract miner presently mining coal from the debtor's reserves, is that if the debtor does not survive Nally and Hamilton will

lose investment and start-up costs approximating $3,000,000; that it will lose an additional $250,000 in prospecting and road construction costs; that it will cost approximately $1,000,000 to close the mine in which it operates; and that its 72 mining employees will lose their jobs.

"Equity ... under § 1113 means fairness under the circumstances, not a comparative dollar-for-dollar concession." *Walway,* 69 B.R. at 974 (citing *Allied Delivery System,* 49 B.R. at 703). The debtor supports its proposal by establishing the profitability of purchasing coal from contract miners. The Union's proposal is unsupported by cost figures of any kind.

The record establishes that all of the affected parties are treated fairly and equitably.

### E

THE DEBTOR MUST PROVIDE TO THE UNION SUCH RELEVANT INFORMATION AS IS NECESSARY TO EVALUATE THE PROPOSAL.

The parties, through the "Stipulations" filed August 5, 1991, stipulate the debtor's compliance with this factor.

### F

BETWEEN THE TIME OF THE MAKING OF THE PROPOSAL AND THE TIME OF THE HEARING ON APPROVAL OF THE REJECTION OF THE EXISTING COLLECTIVE BARGAINING AGREEMENT, THE DEBTOR MUST MEET AT REASONABLE TIMES WITH THE UNION.

The parties, through the "Stipulations" filed August 5, 1991, stipulate the debtor's compliance with this factor.

### G

AT THE MEETINGS THE DEBTOR MUST CONFER IN GOOD FAITH IN ATTEMPTING TO REACH MUTUALLY SATISFACTORY MODIFICATIONS OF THE COLLECTIVE BARGAINING AGREEMENT.

■ "Good faith bargaining is conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process." *Walway,* 69 B.R. at 973. The debtor, commencing May 17, 1991, the date it filed its Chapter 11 petition, submitted its initial proposal to the Union. Thereafter, it submitted numerous other proposals and counter-proposals and met with Union representatives on numerous occasions to engage in bargaining discussions. There is nothing in the record to suggest that the debtor at any time negotiated other than in good faith with the Union.

The court finds that the debtor's conduct at all times during negotiations conformed to the good faith requirement mandated under § 1113(b)(1)(B)(2).

### H

THE UNION MUST HAVE REFUSED TO ACCEPT THE PROPOSAL WITHOUT GOOD CAUSE.

■ The term "good cause" is undefined in § 1113. However, it is clear that while the debtor "retains the ultimate burden of persuading the court that the union lacked good cause for refusing proposed modifications, the union must come forward with evidence of 'its reason for declining to accept the debtor's proposal in whole or in part.'" *Carey Transportation,* 816 F.2d at 92. In the instant proceeding, the Union's refusal to accept the debtor's proposed modifications is premised on the fact that the debtor's proposal did not guarantee jobs to bargaining unit employees. The Union, however, offers no evidence to rebut the debtor's proof which clearly establishes that it is not economically feasible for the debtor to continue production from its Leatherwood mine.

The record before the court establishes that the debtor has sustained severe and continuous operating losses from its production operations, both pre-petition and post-petition; that these losses are but partially remedied by the interim relief afforded the debtor under § 1113(e) on May 31, 1991; that the debtor cannot reorganize through its continued efforts at producing

coal from its Leatherwood complex; that the debtor has maintained a positive cash flow subsequent to the interim relief granted June 10, 1991, authorizing its unlimited use of contract miners; that the debtor's reorganization potential is through its ability to purchase coal through contract miners; and that the Union's insistence that any modification to the May 5, 1990 Contract compel contract miners to hire their work force from laid off Union employees and to agree to be bound by the terms of the May 5, 1990 Contract would shift the economic problems which necessitated the filing of the debtor's Chapter 11 petition to the contract miners. Further, the Union offers no solution to the debtor's inability to obtain workers compensation insurance.

The Union has rejected the debtor's proposed modifications without good cause.

## I

### THE BALANCE OF THE EQUITIES MUST CLEARLY FAVOR REJECTION OF THE COLLECTIVE BARGAINING AGREEMENT.

 "In considering whether the equities favor rejection, courts have followed the reasoning of *Bildisco & Bildisco*,[15] that the court must focus on the ultimate goal of chapter 11. The Bankruptcy Code does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization." 5 *Collier On Bankruptcy* ¶ 1113.01[4][d][iii][C] (15th ed. 1990). *Citing Carey Transportation,* 816 F.2d 82.

One court, in a case decided shortly after enactment of § 1113, observed:

In *Bildisco,* the Supreme Court described the "balance of the equities" test as "higher than that of the 'business judgment' rule, but a lesser one than that embodied in the *REA Express*" case.[16] 104 S.Ct. at 1196. In striking the balance in this test, the Supreme

Court stated that a Bankruptcy Court must focus on the goal of Chapter 11 when considering those equities, and must consider only how the equities relate to the success of the reorganization. *Id.* at 1197. The Supreme Court further stated,

Determining what could constitute a successful rehabilitation involves balancing the interests of the affected parties—the debtor, creditors, and employees. The Bankruptcy Court must consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative difference between the types of hardship each may face.

*In re Salt Creek Freightways,* 47 B.R. 835, 841 (Bankr.D.Wyo.1985).

The primary question in a balancing test is the effect rejection of the contract will have on the debtor's prospect for reorganization. In the instant proceeding, rejection of the Contract will give the debtor a chance at rehabilitation. The debtor has established that without rejection of the May 5, 1990 Contract it will be forced to liquidate. It has further established that the potential of unsecured creditors and equity security holders to realize any benefit from this bankruptcy case is through reorganization and not liquidation. The debtor has shown that it continues to lose money notwithstanding the interim relief it has been granted with respect to wage and other benefit reductions and that it cannot effectively reduce its costs to permit it to produce coal at a profit. Present costs, including labor costs, are simply beyond the debtor's ability to pay. If the debtor is

**15.** *Nat'l. Labor Relations Bd. v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

**16.** *Brotherhood of Railway Airline and Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.1975), *cert. denied,* 423 U.S. 1073, 96 S.Ct. 855, 47 L.Ed.2d 82 (1976).

to reorganize its continuing losses must be stopped.

If the debtor's Application is denied, the Union's victory is hollow. The debtor cannot operate under the May 5, 1990 Contract. It will therefore be required to liquidate to the detriment of all parties including the Union. The court accordingly finds that the debtor has met its burden of proof on this issue.

## IV

The debtor raises one final significant issue for consideration by the court. It contends that the Union's proposals regarding contract miners are violative of the NLRA. Specifically, the debtor asserts that the Union's insistence that any new contract miner must be required to adopt and become a party to the May 5, 1990 Contract is a potential, if not actual, violation of § 8(e) of the NLRA.[17] The debtor further contends that the Union's insistence that the Contract be modified to require any new contract miner to employ 100% of its work force from Union labor is violative of §§ 7 and 8(a)(1) of the NLRA.[18] The debtor cites persuasive authority in support of its contention that these two proposals constitute unfair labor practices, and that the Union is, therefore, not bargaining in good faith in its insistence upon the debtor's acceptance of these proposals as a condition to an agreement.

The Tenth Circuit in *Mile Hi Metal, supra,* was confronted with a proposal by a debtor containing modifications to a collective bargaining agreement, which, if implemented, would violate labor law. The court observed that § 1113 was intended to "operate expeditiously" and that "[w]hen the parties are unable to arrive at mutually satisfactory modifications, the bankruptcy court is entitled to use its own rules and procedures in addressing an allegation of illegality." 899 F.2d at 891. The court concluded:

> The bankruptcy court has no authority to adjudicate unfair labor practice claims. It should simply take them into account in determining whether the debtor's proposed modifications satisfy section 1113(b)(1)(A).

*Id.* (footnote omitted). The court further observed that the provisions of § 1113(b)(2) "require that both parties confer in good faith"; that § 1113(c)(2) "requires the union to have 'good cause' for rejecting the proposal"; and that "[t]hese two subparts impose an obligation on the union to participate meaningfully in the negotiations and to explain its reasons for opposing the proposal." 899 F.2d at 892 (citations omitted).

The Union's insistence that modifications to the May 5, 1990 Contract must include language compelling contract miners to hire their entire work force from the panel of the debtor's laid off bargaining unit employees and that the contract miners

---

**17.** Section 8(e) provides in material part:

(e) **Enforceability of contract or agreement to boycott any other employer; exception**

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforceable and void....

29 U.S.C.A. § 158(e) (West 1973 & Supp.1991).

**18.** Sections 7 and 8(a)(1) provide in material part:

**Right of employees as to organization, collective bargaining, etc.**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C.A. § 157 (West 1973).

(a) **Unfair labor practices by employer**

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title....

29 U.S.C.A. § 158(a)(1) (West 1973 & Supp. 1991).

must agree to be bound by and become parties to the Contract is unequivocally set forth in the first and final proposals submitted the debtor by the Union on June 27 and August 12, 1991. This position was reiterated by the Union from the witness stand through testimony of Johnny Adams, President of Local No. 188.

The Union's good faith in bargaining on the contract miner issue is further brought into question through the testimony of one of its bargaining representatives, Jim Polly.[19] Mr. Polly, in response to a question from the debtor's counsel, affirmed that at the conclusion of the meeting of creditors held July 16, 1991, he informed the debtor's president, Ted Helms, that rather than allow the debtor to use contract miners, the Union would support a motion by the debtor's major secured creditors to liquidate the debtor. The verbatim exchange between the debtor's counsel, Mr. Hagood, and Mr. Polly follows:

Q. I'll ask you if you had a conversation with Mr. Ted Helms after the creditors meeting here.

A. I believe I spoke with Ted—yes.

Q. O.K. And after the creditors meeting, and you said in source or in substance to Ted Helms that rather than let this company use outside contractors the Union will support the Bank's motion to liquidate this business. You said that didn't you Mr. Polly?

A. I believe I made that statement. Yes sir.

Finally, in the "Stipulations" filed by the parties on August 5, 1991, the Union stipulates that the debtor provided it "with such relevant information as is necessary to evaluate the proposals." The record establishes, however, that the Union did not employ an accountant to look over the financial information provided by the debtor and that it did not consider what the cost of production would be to the debtor under the June 27 or August 12, 1991 proposals. The Union made its proposals without consideration of the economic impact on the debtor.

The three factors discussed above, the arguable illegality of the Union's proposals regarding the debtor's ability to use contract miners, Mr. Polly's statement to the debtor's president at the conclusion of the meeting of creditors, and the Union's failure to evaluate information provided it by the debtor in support of its proposals, lead to the conclusion that the Union, with knowledge of the debtor's history of substantial losses from the operations at its Leatherwood mines, and with knowledge of its inability to obtain workers compensation insurance coverage, chose to bring the bargaining sessions to an impasse through its unwillingness to bargain on the issue of contract miners.

■ As pointed out by the Tenth Circuit in *Mile Hi Metal*, the bankruptcy court has no authority to adjudicate unfair labor practice claims. The court "should simply take them into account in determining whether the debtor's proposed modifications satisfy section 1113(b)(1)(A)." 899 F.2d at 891. The court declined to delineate specific consequences resulting from alleged illegal proposals, but indicated that the offending party should suffer some adverse consequences. The court stated:

We do not decide the proper consequences of a refusal to confer in good faith, but clearly some adverse consequence should befall an intransigent party. At the very least, a union's lack of participation should be considered when the court decides whether the union had good cause to reject the proposal and whether the balance of equities favors rejection of the agreement. Other resources may also be available to the bankruptcy court.

899 F.2d at 892 n. 6 (citations omitted).

■ The court concludes that the intransigent position of the Union on its proposals regarding contract miners, which effectively served to bring the bargaining

---

19. Mr. Polly has been employed by the debtor since 1965. Although he holds no office with Local No. 188, he is presently secretary of the International Union. Mr. Polly was a representative of the Union's bargaining committee in all post-petition bargaining sessions except the initial session on May 17, 1991.

sessions to an impasse, further supports the conclusion that the Union did not have good cause to reject the debtor's proposals and that the balance of equities favors rejection of the May 5, 1990 Contract.

### V

For the reasons set forth herein, the court finds that the debtor has met its burden of proof under § 1113(b) and (c). Its Application will accordingly be granted.

This Memorandum constitutes findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052.