**In re VALLEY STEEL PRODUCTS COMPANY, INC. et al.,**
**Debtors/Movant.**

**Bankruptcy No. 92–40778–293.**
**Motion No. 191.**

United States Bankruptcy Court,
E.D. Missouri, E.D.

July 7, 1992.

Patrick Sanders, Clayton, Mo., for debtors.

Clyde E. Craig, St. Louis, Mo., for Local 688.

Norman W. Pressman, St. Louis, Mo., for Unsecured Creditors' Committee.

Susan Spraul, St. Louis, Mo., for Congress Financial.

James S. Cole, Asst. U.S. Trustee, St. Louis, Mo.

## MEMORANDUM OPINION

DAVID P. McDONALD, Chief Judge.

### JURISDICTION

This Court has jurisdiction over the parties and subject matter of this proceeding pursuant to 28 U.S.C. §§ 1334, 151, and 157 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(A), which the Court may hear and determine. The Debtors seek to reject a collective bargaining agreement with approximately 40 drivers who are represented by Local Union No. 688 Affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters") pursuant to 11 U.S.C. § 1113.

### PROCEDURAL BACKGROUND

This cause was heard pursuant to Debtors' Motion for Modification or Rejection of a Collective Bargaining Agreement. The motion was filed on May 21, 1992 and heard on June 12, 1992.

### FACTUAL BACKGROUND

Upon consideration of the pleadings, exhibits, testimony, argument of counsel and briefs the Court makes the following findings of fact:

1. Valley Steel Products Company, Inc. ("Valley Steel") and VSPC Transportation Company ("Transportation") (jointly referred to as the "Debtors") are both corporations duly organized and existing according to law.

2. Local Union No. 688, affiliated with the International Brotherhood of Team-

sters, Chauffeurs, Warehousemen and Helpers of America ("Teamsters" or "Local 688") is a voluntary unincorporated labor organization within the meaning of § 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. 185 which represents employees in an industry affecting commerce within the meaning of §§ 2(5) and 2(7) of the LMRA, 29 U.S.C. 152(5) and (7).

3. Valley Steel is engaged in the business of the manufacture and sale of various steel and metal products, primarily metal pipe.

4. Transportation is principally engaged in the business of providing freight service for Valley Steel and, to a limited extent, provides freight hauling on a contract basis for third parties unrelated to the Debtors.

5. Debtors commenced their Chapter 11 case on February 4, 1992 and have operated their businesses as debtors in possession continuously since that date.

6. Local 688 represents Debtors' classified hourly employees within its Transportation operation ("Drivers"). Transportation has had a collective bargaining relationship with the Teamsters for many years. The Drivers are currently covered by the terms of a collective bargaining agreement negotiated by Local 688. At the time of the hearing, Transportation employed approximately 40 Drivers on more or less a full-time basis. The Debtors hire the Drivers, who as owners-operators, use their own tractors to perform driving services for the Debtors. Transportation owns the trailers that the Drivers use to haul Valley Steel's products.

7. Debtors entered into the current collective bargaining agreement ("Agreement") with the Teamsters covering Debtors' "over the road" freight services operations, which by its terms runs from January 1, 1991 until December 31, 1993.

8. The Agreement determines the wages, hours and working conditions of the Drivers, including the hourly and mileage-based compensation Debtors pay the Drivers. The Drivers own their own tractors which they lease to the company. Under the Agreement, Valley Steel pays the Drivers both a driving services fee based on mileage driven and a mileage-based rental designed to compensate the Drivers for the use of their tractors. The company subsidizes the drivers' fuel costs in excess of forty cents per gallon.

9. Among other terms, the Agreement requires Debtors to make weekly payments to the Central States Southeast and Southwest Health and Welfare Fund, a Taft–Hartley Trust, which provides health and welfare benefits for the Drivers. The Agreement also obligates the Debtors to make weekly payments to the Central States, Southeast and Southwest Pension Fund ("Pension Fund") which provides the Drivers with pension coverage.

10. During the last calendar year, the Debtors have substantially reduced the size of their operations. Debtors have reduced total number of employees from approximately 400 in March, 1991 to approximately 200 at the present time. The total annual sales generated by Debtors' operations has decreased from approximately $75,000,000 in 1990 to a current projected level of $30,000,000 in fiscal 1992.

11. Debtors prepared and presented to Local 688 proposals for the modification of the Agreement due to the bankruptcy of Debtors ("Proposals"). The Proposals were presented to Local 688 at a meeting on May 19, 1992 at the offices of Local 688. Local 688's representatives told the Company that they understood the Proposals and that the Company would be contacted by Local 688 after Local 688 discussed the Proposals with the employees' bargaining committee and the Drivers. Local 688 did not contact the Debtors to request additional negotiations or discussions.

12. On May 19, 1992, Debtors' representatives provided Local 688 with copies of Transportation's operating statements for the years 1989, 1990, 1991 and projected 1992; the consolidated balance sheets as of April 30, 1992, November 30, 1991 and November 30, 1989; and a copy of Debtors' monthly bankruptcy operating report for March, 1992.

13. The Union representatives who received the Proposals did not recommend

that Local 688's membership accept the Proposals because they felt the Union had previously agreed to substantial cost concessions in negotiating the current and two prior contracts. The representatives believed that the Proposals contained both cost and non-cost items; and, among other things, sought substantial reductions in the mileage rates and elimination of health insurance, pension coverage and the fuel subsidy to the extent that if adopted, the cost concessions would make it economically not feasible for the Drivers to continue to operate and ultimately put those who tried to operate under such conditions out of business. The Drivers rejected the Proposals unanimously.

14. Debtors presented the Proposals and requested that Local 688 negotiate to accomplish the proposed modifications to the Agreement. The Teamsters did not negotiate or offer a counter proposal at any time. Ira Levi, Teamsters Vice President and Business Representative of Local 688, testified that the Teamsters did not negotiate because the Debtor presented the proposal modifications as a minimum the company needed to operate. The Teamsters felt the Company's "minimum needs" would put the drivers out of business and so saw no point in negotiating as there did not appear to be any common ground between the parties. When cross examined by Debtors' counsel as to whether Mr. Levi was even willing to negotiate a penny, Mr. Levi responded, "I may have budged a penny."

15. At no time since the Proposals were presented on May 19, 1992 have Debtors refused to meet with Local 688.

16. Since receiving Debtors' Proposals on May 19, 1992, Local 688 has not asked the Debtors to provide additional financial information.

17. The current actual cost Valley Steel incurs in shipping its product to its customers utilizing the current Transportation Drivers exceeds the current cost of shipping the same freight via common carriers and other third-party entities, by between $100,000 and $120,000 a month or 1.2 million to 1.4 million dollars annually.

18. Debtors have lost money in the two years preceding the filing of their Chapter 11 petitions. Transportation's expenses have substantially exceeded revenue during the last three calendar years by a total of 2.587 million dollars.

19. Debtors' Proposals seek to modify the Agreement to reduce the cost of operating under the Agreement to the cost Debtors would incur in satisfying their shipping needs through common carriers and third parties.

20. During the period prior to the filing of Debtors' petitions and thereafter, Debtors have undertaken efforts to restructure their businesses and to reduce their operating costs. The total number of Debtors' employees has been reduced by approximately 50 percent. Substantially all of these reductions have come from the ranks of Debtors' non-represented employees. Transportation has reduced its management work force from nine full-time to four full-time personnel and the remaining four have taken a 10% pay cut. The Creditors' Committee ("Committee") has taken the position that if Debtors are not permitted to reject the Agreement, the Committee will move to convert Debtors' Chapter 11 proceedings to a Chapter 7 liquidation.

21. Debtors currently plan to liquidate between 75 and 80 percent of their operations and carry forward only the remaining 20 to 25 percent of their operations.

22. A complete liquidation of Debtors would cause all of Debtors' employees, including the Drivers to lose their jobs and increase the losses Debtors' creditors would sustain.

23. Debtors' cost of operating Transportation for the quarter consisting of December, 1991 and January and February, 1992 ("First Quarter") was $1,006,000.

24. Utilizing the public rates being charged by common carriers and current suppliers of transportation services to Transportation, it would have cost approximately $646,000 to move the freight requirements of Valley Steel during the First Quarter. The additional cost to Debtors to operate Transportation was $360,000 dur-

ing the First Quarter. This level of loss for fiscal 1992 would produce an additional 1992 annual loss of 1.440 million dollars.

25. Valley Steel can secure all of its transportation needs from common carriers and contract third-party transportation sources. Valley Steel has shipped its freight on common carriers and third-party transportation services for many years without adverse business ramifications. The common carriers have provided capable and competent service, without any greater damage to the freight or increase of customer complaints than the Teamster Drivers.

26. If Debtors were to engage in a total withdrawal from the Pension Funds, the current estimate of withdrawal liability is $755,239.62 (based upon a hypothetical 1991 withdrawal).

27. Debtors' continued operating losses threaten the ability of Debtors to successfully reorganize and reduce any dividend which Debtors' creditors may receive.

28. The proposed modifications to the Agreement would effect a ten percent reduction in Drivers' salaries and wages which are paid in the form of pay based on cents per mile; a seven percent reduction in tractor rental rates paid to Drivers; and the elimination of the fuel subsidy, health and welfare and pension payments for the Drivers. Debtors would effect an annual savings of between 1 and 1.2 million dollars. The proposed wording changes would also decrease operating costs by an estimated annual savings of $200,000 by increasing the Debtors' flexibility in layoffs, improving the Debtors' dispatch procedures and relaxing work rules. Debtors' witnesses were careful to point out that it was difficult to provide an exact dollar amount in savings as a result of the proposed wording changes and the $200,000 was simply their best estimate.

## DISCUSSION

The Debtors seek the modification of the Collective Bargaining Agreement on terms mutually acceptable to the Debtors and the Teamsters or in the event that the Teamsters refuse without good cause to modify the Agreement the Debtors then seek authorization to reject the Agreement, pursuant to 11 U.S.C. § 1113. Congress enacted § 1113 in response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), which recognized the debtor's right to unilaterally reject a collective bargaining agreement. Shortly after the enactment of § 1113, Judge Robert J. Kressel expounded a now widely accepted nine-point test, defining when a court should approve the rejection of a collective bargaining agreement pursuant to 11 U.S.C. § 1113, *In re American Provision Co.*, 44 B.R. 907 (Bankr.D.Minn.1984). Under Judge Kressel's methodology, the court should approve a debtor's rejection of a collective bargaining agreement only after the following requirements have been met:

"1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.[2]

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement." *Id.* at 909.

2. This requirement is very similar to the second requirement, although somewhat different. The second requirement dictates that the proposal be *based* on certain information and the fifth requirement requires the debtor to *provide* that information to the Union.

In reference to this nine-point test the Teamsters asserted in their brief that "Debtors have failed to satisfy Nos. 3, 4, 8 and 9 of these requirements." Thus the Teamsters acknowledged and I so find that the Debtors have met their burden as to paragraphs 1, 2, 5, 6, and 7.

In order to ascertain whether the Debtors have met the above requirements of paragraph 3 it is necessary to determine what was the intended meaning of the word "necessary" as used in the following pertinent portion of § 1113(b)(1)(A): "... which provides for those necessary modifications in the employees benefits and protection that are necessary to permit the reorganization of the debtor...." A split exists between the circuits:

"... as to whether necessary modifications are those that are essential to prevent liquidation or those that also will enable reorganization to occur. Compare *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America,* 791 F.2d 1074 (3rd Cir.1986) with *Truck Drivers Local 807 v. Carey Transportation, Inc.,* 816 F.2d 82 (2d Cir.1987). *Wheeling* adheres to a stricter view allowing only absolutely minimal changes intended to forestall Liquidation. 791 F.2d at 1088–89. *Carey* takes a broader view and allows modifications that promote the long term reorganization of the debtor. 816 F.2d at 90." *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363 (Bankr.N.Ill.1990).

The *Carey* Court held that section 1113(b)(1)(A):

"places on the debtor the burden of proving that its proposal is made in good faith, and that it contains necessary, but not absolutely minimal, changes that will enable the debtor to complete the reorganization process successfully."

To hold that "necessary" requires minimal changes in the collective bargaining agreement may well result in meaningless and unsuccessful reorganizations. It would not be in the best interest of the Debtors, employees or the creditors to attempt to fine tune the necessary changes to a minimal standard that would greatly enhance the chances of an unsuccessful reorganization. As stated in *Carey,* 816 F.2d at 89:

"The goal to be served by modifying the collective bargaining agreement, and by the entire Chapter 11 proceeding, is not simply a reorganization, but a successful reorganization, i.e., one from which the debtor emerges as an economically viable operation."

After reviewing the *Wheeling* and *Carey* decisions this court finds the Second Circuit's *Carey* opinion more compelling and persuasive and therefore this Court shall follow the *Carey* decision. *See, In Re Mile Hi Metal Systems, Inc.,* 899 F.2d 887 (10th Cir.1990). Accordingly, the Court finds that the Debtors have met their burden as required by paragraphs 3 and 4 and as set forth in *Carey.* They have acted in good faith in their effort to modify the collective bargaining agreement. In an effort to save at least part of their organization/enterprise, the Debtors have restructured their business by liquidating 75 to 80 percent of their operations; have reduced the number of employees from approximately 400 to 200 during the last year, most of whom were from the ranks of non-represented employees; and have reduced Transportation's management from nine full-time personnel to four full-time personnel, with the remaining members of management receiving a 10 percent pay reduction.

In contrast, the Teamsters have ignored the Debtors' Proposals and have not made any efforts to negotiate or provide a counter proposal. The Union argues it has good cause to refuse to accept the Proposals. First, the Teamsters testified that they had previously shown their good faith by agreeing to substantial cost concessions in negotiating the current and two prior contracts. However, they failed to offer any evidence or examples to substantiate this assertion. Second, they assert that if the Proposals were accepted the Teamsters

would be unable to continue their businesses due the reduction in income. One driver testified that he would annually lose approximately $27,000. The amount of income lost would vary from driver to driver, depending on the miles driven and miscellaneous expenses. It is clear that the Proposals would have a negative impact on the Teamster Drivers' incomes. It is equally clear that if the Debtors do not receive these concessions they will be forced to liquidate and the Teamsters will be unemployed. The Debtors presented very convincing evidence showing that the Debtors could save between $100,000 and $120,000 monthly if they used common carriers in lieu of the Teamsters to satisfy their shipping needs. The proposed modifications treat the creditors, the debtors, the Teamsters and other affected parties fairly and equitably. In fact, the Creditors' Committee voiced its approval of the Debtors' Proposals. The Teamsters refused to negotiate and/or accept the Proposals with cause, but not with good cause.

Under the circumstances of this case, since the Teamsters were unwilling to negotiate a modification of the Agreement, the balance of the equities clearly favor the rejection of the collective bargaining agreement. It is true that the rejection of this Agreement may not be sufficient to save the company and permit it to reorganize. However, it is clear that because the Teamsters have refused to negotiate any modifications, the economic burden of the existing collective bargaining agreement will prevent a successful reorganization and result in the final liquidation of the Debtors. Obviously, such liquidation will result in a loss of jobs for all employees, including those jobs held by the Teamsters, and a reduction in potential distribution to creditors.

The Teamsters point out that if the Court allows the rejection of this collective bargaining agreement the Debtors will incur substantial employer withdrawal liability in the approximate amount of $755,239.62. If this withdrawal liability is classified as a post petition administrative expense, as urged by the Teamsters, then it would be uneconomical for the Debtors to reject the Agreement, since cost of continued operations under the Agreement would be cheaper than paying the $755,239.62. The Teamster reliance on *Central States Pension Fund v. Bellmont Trucking Co., Inc.*, 788 F.2d 428, 430–431 (7th Cir.1986) to support their position that withdrawal liability must be treated as a post petition liability is misplaced. The *Bellmont* case is silent on whether the imposition of withdrawal liability should be classified as prepetition or post petition administrative expense. The Debtors correctly relied on *In re Chateaugay Corporation*, 87 B.R. 779, 798 (Bankr. S.D.N.Y.1988), wherein the Court held:

> "Courts considering the status of such claims uniformly have held that withdrawal liability is based on vested benefits relating to prepetition services and that claims for withdrawal liability are prepetition claims."

The withdrawal liability which will be created in the instant case by the Debtors' rejection of the Agreement is a prepetition debt. *See Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.* 789 F.2d 98 (2d Cir.1986); *In re United Dept. Stores, Inc.*, 49 B.R. 462, 465–66 (Bankr.S.D.N.Y.1985).

Based upon the testimony, evidence adduced at the June 12, 1992 hearing and consideration of the briefs the Court finds that the special requirements for rejection of the current collective bargaining agreement between the Debtors and the Teamsters have been met. Accordingly, the Debtors' Motion For Rejection of the Collective Bargaining Agreement is GRANTED and Debtors' Motion For Modification is DENIED as moot.

An Order consistent with this Memorandum Opinion will be entered this date.