### In re ALABAMA SYMPHONY ASSOCIATION, Debtor.

#### Bankruptcy No. 93–00457.

United States Bankruptcy Court,
N.D. Alabama, S.D.

May 17, 1993.

John P. Whittington, Stuart M. Maples, J. Patrick Darby, Bradley, Arant, Rose & White, Birmingham, AL, for debtor.

Jerry W. Schoel, Paul A. Liles, Paul A. Avron, Schoel, Ogle, Benton & Centeno, Birmingham, AL, for Birmingham Musicians Protective Ass'n.

Robert W. Tapscott, Birmingham, AL, for AmSouth Bank.

## MEMORANDUM OPINION

TAMARA O. MITCHELL, Bankruptcy Judge.

This proceeding is before the Court on the Debtor–In–Possession's application to reject its collective bargaining agreement with the Birmingham Musicians' Protective Association, Local 256–733, of the American Federation of Musicians and on the Debtor–In–Possession's Motion for Authority to Limit Cafeteria Plan Payments. Appearing at the three-day hearing of this motion, conducted on April 15–16, 1993, and April 30, 1993, were John P. Whittington, Stuart M. Maples, and J. Patrick Darby, attorneys for the Debtor, and Jerry W. Schoel, Paul A. Liles, and Paul A. Avron, attorneys for the Musicians' Protective Association. This Court has jurisdiction. 28 U.S.C. § 1334(a) and (b). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A) and (O). The Court has reviewed the testimonial and documentary evidence, the briefs and arguments of counsel, and the law, and concludes that the Debtor is entitled to reject the collective bargaining agreement and to limit payments to the cafeteria plan at issue.[1]

## I. INTRODUCTION

The Alabama Symphony Orchestra Association (the Symphony) was formed in 1933 and reincorporated under the laws of Alabama relating to nonprofit corporations in August of 1982. The Symphony took its present name[2] in November of 1986 in an effort to extend its benefit to the arts throughout the state of Alabama, and is currently the state's official symphony orchestra. Prior to filing its voluntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101–1174 (hereinafter the Code), the Symphony conducted a 45–week season, during which it played 75 symphonic and pops concerts throughout the state, and employed 85 people, including 74 musicians. The Symphony estimates that some 200,000 to 300,000 people enjoy its music every year.

The Alabama Symphony Foundation (the Foundation) was incorporated in November of 1987. Its purpose is to support the Symphony by establishing a permanent endowment fund. The Foundation is a distinct legal entity, and currently holds approximately one million dollars in its endowment fund. It receives $50,000 to $70,000 per year in interest on funds held in trust.

The Birmingham Musicians' Protective Association (the Musicians) is a division of the American Federation of Musicians, and is the collective bargaining unit authorized by the Labor Management Relations Act, 29 U.S.C. §§ 141–197 (hereinafter the Labor Act), to which the musicians belong. This organization protects their interests and pursues their remedies provided under the Labor Act.

The Collective Bargaining Agreement (CBA) between the Symphony and the Musicians is a comprehensive, 61–page document detailing the working relationship of the parties. Debtor's Ex. 8 (1991–1992 through 1993–1994 Agreement Between The Birmingham Musicians' Protective Association Local 256–733 American Federation of Musicians and The Alabama Symphony Orchestra Association). The document regulates all aspects of the Musicians' working environment, from their wages and benefits to the temperature within the hall in which they perform. The

---

1. This Memorandum Opinion constitutes findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to contested matters by Federal Rule of Bankruptcy Procedure 9014.

2. The Symphony was formerly known as the Birmingham Symphony Orchestra.

CBA reduces wages paid under previous agreements, but also provides that in the third year of the agreement the Musicians' compensation will return to pre–1991 levels. This "snap-back" provision, the Symphony claims, precludes its effective reorganization under the bankruptcy laws. The Musicians claim that the document levels the playing field between management and labor and protects their power to effectively bargain with the Symphony.

The cafeteria plan is a flexible benefits plan created in accordance with Section 125 of the Internal Revenue Code, and is maintained for the benefit of the Symphony's employees, including the Musicians. Under the terms of the plan, an employee electing to receive benefits may request the Symphony to deduct money from the employee's wages to be set aside for payment of medical expenses, but cannot receive benefits over the amount the employee has actually contributed to the plan. However, for several months prior to its bankruptcy the Symphony administered the plan by voluntary compliance with a proposed Treasury Department regulation that would require an employer to make available at the beginning of the year the entire amount to be contributed that year. The Symphony wants to return the plan to its express terms and end its voluntary compliance with the proposed regulation, but under the CBA is prevented from modifying or amending the plan.

Mark Walker has been the executive director of the Symphony since 1990. He has worked with the Minnesota Symphony as an intern through a program sponsored by the Ford Foundation, the Baltimore Symphony as director of regional development, the Denver Symphony as assistant manager and orchestra manager, the Kansas City Philharmonic as general manager, and the Seattle Symphony as manager. His experience has involved management, negotiations concerning collective bargaining agreements, and lobbying state governments for grant monies.

David Handler is a section violinist with the Symphony and the Musicians' authorized representative. He has been employed by the Symphony since September of 1977, and is currently the chairman of the orchestra committee. As a committee chairman, he is also a member of the Symphony's board of directors. He also serves on the finance committee. He negotiated the current CBA on behalf of the Musicians.

Although the aforementioned individuals and the entities they represent are the major players, in orchestral terms the first chairs, the outcome of this dispute affects others. There is concern that the city of Birmingham and the state of Alabama might lose the artistic and social diversity the Symphony provides. Aside from these ethereal concerns, the Symphony has a tangible economic effect on the city. Larry Johnson, vice-president of program development with the Birmingham Chamber of Commerce, testified in this proceeding concerning the chamber's Economic Impact of the Arts study. Debtor's Ex. 25. The chamber estimates that the Symphony's expenditures account for 19 percent of the $47.9 million spent by arts organizations. Debtor's Ex. 30. Also affected by the fate of the Symphony are the approximately 2,000–3,000 season-ticket holders, who upon the Symphony's filing in this Court were converted from patrons of the arts to creditors of a debtor in bankruptcy. Non-season-ticket holders would also be affected, as would visitors to the city and others interested in symphonic music. Johnson testified that the presence of a symphony orchestra in a city or state makes an appreciable difference in the ability to attract new businesses.

The witnesses in their testimony, counsel for the parties in their arguments, and others at the periphery of this proceeding[3] appeared to the Court to be quite candid and dire concerning the stakes involved. Says the Symphony: Modification or rejec-

---

**3.** *See, e.g.,* Frederick Kaimann, *Court begins to decide ASO's fate this week,* Birmingham News, April 11, 1993, at F1, stating that the future of the Symphony depends on this Court's rulings.

Although referred to periodically herein for background information, newspaper articles are not in evidence and had no part in this Court's determination of this issue.

tion of this motion is critical to its efforts to reorganize. Saddled with the current CBA, the Symphony cannot function and everyone, including the Musicians, lose. Say the Musicians: Retention of the CBA is critical to our efforts to bargain collectively. Without this agreement, the bargaining table is tilted so steeply that we will be unable to reach across it.

Expressed in more theoretical terms, the decision to reject the CBA will have "moral, political, social, and personal meaning to ... various individuals and may affect the lives of their families and the life of their community." [4] Rejection may risk frustrating the values of the Labor Act and could possibly lead to economic warfare.[5] On a broader scale, the rejection may "inspire future debtors to use the bankruptcy system strategically ... and rid themselves of troublesome unions." [6] These latter concerns touch the heart of Bankruptcy Code Section 1113, the Labor Act, and the treatment of collective bargaining agreements in bankruptcy in the post-*N.L.R.B. v. Bildisco and Bildisco* [7] era.

If there is any encouragement for the parties, the Symphony voiced its commitment on the record in this case that it would, if the Court approves its application for rejection, bargain first with the same Musicians, and if unsuccessful in retaining their services, then with other union musicians, rather than with non-union players.

## II. FINDINGS OF FACT

The Symphony has had financial trouble throughout the 1980's, operating at a deficit since the early part of the decade. At the time of its filing in this Court, it owed approximately $1.745 million. The 1992–93 season opened September 14, 1992, under a cloud of bad publicity and financial worries. The Symphony entered the 1992–93 season with a budget that projected a surplus of $3,371.00.[8] Debtor's Ex. 9. This budget became less optimistic when in the fall of 1992 grants from governmental entities, which accounted for approximately 29 percent of the Symphony's 1992–93 budget and had declined in recent years,[9] were not forthcoming for the 1992–93 season. The Symphony employed Birmingham attorney George McMillan, former Alabama Lieutenant Governor, to lobby in Montgomery for the remainder of the expected funds, but a bill to provide the Symphony with these funds failed in the state house of representatives. Subsequently, the receipt of state grants appeared feasible for 1992–93 because of last-minute appropriations by then-Governor Guy Hunt, until a lawsuit filed by state Senator Mac Parsons in December of 1992 halted the flow of state

---

**4.** Donald R. Korobkin, *Value and Rationality in Bankruptcy Decisionmaking,* 33 Wm. & Mary L.Rev. 333, 341 (1992) (hereinafter *Value and Rationality*). This article questions, criticizes, and explores the bankruptcy decisionmaking process specifically in terms of an application for rejection of a CBA under Bankruptcy Code Section 1113.

**5.** *Id.* at 342.

**6.** *Id. See also,* Douglas G. Baird, *A World Without Bankruptcy,* 50 Law & Contemp.Probs. 173 (Spring 1987).

**7.** 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).

**8.** A summary of the Symphony's operating budget for the fiscal year 1992–93 is as follows:

**Revenues**

| | |
|---|---|
| Ticket Sales | $ 990,000.00 |
| Tours and Runouts | $ 245,000.00 |
| Grants | $1,390,900.00 |
| Community Support | $1,907,200.00 |

**Revenues**

| | |
|---|---|
| Miscellaneous | $ 38,800.00 |
| Education | $ 210,033.00 |
| **Totals** | **$4,781,933.00** |

**Expenses**

| | |
|---|---|
| Artistic | $2,752,994.00 |
| Concert Production | $ 616,227.00 |
| Development | $ 228,867.00 |
| Marketing | $ 366,019.00 |
| Regional Development | $ 50,856.00 |
| Finance | $ 145,555.00 |
| Administrative | $ 240,473.00 |
| General | $ 185,445.00 |
| Education | $ 192,126.00 |
| **Totals** | **$4,778,562.00** |

Debtor's Ex. 9.

**9.** The amount of government grants, which included funds from Jefferson County, Alabama, the city of Birmingham, the state of Alabama, and the National Endowment for the Arts, fell from $4,837,574.00 in 1990–91 to $3,807,666.00 in 1991–92. Funding from the state alone fell from $951,730.00 in 1990–91 to $500,271.00 in 1991–92.

money. As a result of the lawsuit, the Symphony only received $500,000.00 from the state for 1992–93.

With the dwindling possibility of further state funds, the Symphony was compelled to approach its lenders [10] to negotiate a debt restructuring agreement,[11] and such an agreement was reached on December 30, 1992. Under the terms of the agreement, seven of nine guarantors on $745,000.00 of the total debt elected to pay their guaranteed portion of the note, while the other two guarantors agreed to a long-term, interest-free payment schedule. As a result of the restructuring, the Symphony remains obligated to guarantors in the amount of $525,000.00. Another portion of the debt, $1 million, was reduced to $750,000.00 [12] and is secured by all Symphony assets. The Foundation must pay interest income in the amount of $70,000.00 per year on the two outstanding obligations, and under the terms of this agreement the Symphony has no more right to receive funds from the Foundation and must maintain a balanced budget. If the Symphony ceases operation, however, the Foundation is no longer obligated to pay the interest income on these obligations. The restructuring left the Symphony temporarily free of pressures from its major creditor, but it cost the Symphony the ability to obtain any more funds on its line of credit.

The Symphony's fall fundraising efforts were also hampered by financial woes and rumors of an impending bankruptcy filing. Walker testified that the fundraising, which usually commences in September, did not begin in the fall of 1992 and thus the fundraising for 1992–93, which was supposed to generate almost $2 million under the budget, Debtor's Ex. 9, only raised approximately $440,000.00 through December of 1992.

Handler testified that the Symphony began attempts to scale back the benefits and compensation of the Musicians as early as mid–1992. On July 7, 1992, he attended a meeting with members of the board of directors and members of the finance committee, where three proposals were offered, all of which entailed significant cuts in the number of players. Musicians' Ex. 3. Under the terms of the "Chamber Orchestra Proposal/Minimum Impact," the orchestra would be reduced to 40 players and play a 42–week season. However, the orchestra would be augmented to 74 people for two Classics concerts, and to 50 people for all Pops concerts. Per diem, transportation, and travel would be reduced by 50 percent. "Chamber Orchestra Proposal/Maximum Impact" would have the orchestra reduced to 40 people with no augmentation for specific performances. Under the "Reduced Core Orchestra Proposal," the orchestra would be reduced to 50 members, with augmentation to 74 members for two Classics concerts, and play a 42–week season. Believing that the proposals would cause a decrease in revenues, Handler contacted Walker on July 10 and voiced his concerns. In late August, Walker arranged a meeting with Mike Warren, the Symphony's chairman of the board and the President and Chief Executive Officer of Energen and Alabama Gas Corporation. At that meeting, Handler testified, bankruptcy was threatened and further concessions were sought. The Symphony appealed to the Musicians' "civic responsibility," although it was noted at the meeting that non-union employees had not been asked to take further cuts. Handler replied that the Musicians were not likely to take further cuts.

At a subsequent meeting, Handler was presented with a proposal that would in-

**10.** A seven-bank consortium was involved in the Symphony's eventual financial restructuring. The banks were AmSouth Bank, Central Bank of the South, Colonial Bank, First Commercial Bank, First Alabama Bank, National Bank of Commerce, and SouthTrust Bank of Alabama.

**11.** The Symphony had sought and obtained an increase in its line of credit with local banks, and borrowed $700,000.00 to meet its January,

1992, payrolls. According to Walker, this was the last extension the banks were willing to give.

**12.** The bank consortium gave the Symphony $250,000.00, which was immediately applied to lower the debt. The banks also substantially reduced the interest rate, dropping it to 2 percent with a provision that it would later increase to a maximum of 4 percent.

crease the Musicians' base salary from $510.00 per week to $548.00 per week, but would reduce the number of weeks from 42 to 38, which would result in a reduction of $596.00 per year in base salary. Musicians' Ex. 4. According to Handler, however, non-union employees were not asked to sacrifice. On September 10, 1992, the orchestra committee met with John Coleman, the Symphony's labor lawyer, where two proposals were discussed. Debtor's Ex. 10. The first proposal assumed full state appropriations of $450,000.00 applicable to the 1991–92 season and $950,000.00 applicable to the 1992–93 season. The first proposal provided for the employment of at least 74 Musicians, cut weeks of employment from 38, and set weekly salaries at $548.00. Health care was limited to a Symphony contribution of $150.00 per month per Musician, and the snap-back provision for 1993–94 was stricken. The second proposal assumed the receipt of no state money, cut the number of players from 74 to 65, dropped the season from 42 weeks to 35 weeks, and cut base salary to $477.00 per week per Musician. The CBA's provision for three weeks of paid vacation was eliminated. Health care was also limited under the second proposal to a Symphony contribution of $100.00 per month per Musician, and the snap-back provision was also stricken. Handler relayed the proposals to the Musicians, who decided not to vote on the proposals. Following the decision not to vote, Walker wrote Handler a letter and requested that the Musicians vote on the proposals. Musicians' Ex. 5. Still, the Musicians did not vote on the September 10 proposal.

The 1992–93 Symphony season opened on September 14, 1992, but the Musicians did not receive their scheduled paychecks on September 15, 1992, although non-Musician employees did. After meeting to discuss these events, the Musicians decided to go forward with rehearsals and performances. They filed a charge with the National Labor Relations Board, alleging that their paychecks were withheld in retaliation for their acts in response to the Symphony's September proposals. The Musicians received their regular paychecks on September 30, 1992.

At a meeting on January 9, 1993, the Musicians were presented with a proposal for changes in the 1993–94 season. Debtor's Ex. 12. This proposal changed the CBA by reducing the number of orchestra members to not fewer than 64, eliminating the summer season, reducing the winter season to 35 weeks, and reducing the total number of services [13] to a maximum of six services per week, except for seven weeks during the year, when the maximum number of services could be extended to eight. The base salary under this proposal was $510.00, and health insurance contributions were limited to $160.00 per month per orchestra member. Retirement and disability leave provisions were also altered. Debtor's Ex. 12. Handler told the Symphony that the Musicians, who had received only half a regular paycheck in mid-January 1993, would continue to work only if they received full paychecks. The Symphony requested a response to the latest proposals by January 18, and on January 12 the Musicians voted 64–3 to reject the January 9 proposal.

On the day the Musicians performed their final concert, Walker wrote a letter to each Musician in an apparent attempt to gain reconsideration of the January 12 vote. Musicians' Ex. 2. At the same time the Musicians, according to Handler, were awaiting full payment of their mid-January paychecks, at which time they would decide

---

**13.** A service is a block of time consisting of two and a half hours under the CBA. The Musicians are required to render a certain number of services per week, and these services can be in either rehearsal or performance time. During the hearing of this motion, much was made of the small amount of time required under the CBA. However, Handler testified that the Musicians typically spend time on their own learning their parts and maintaining a certain level of quality. Handler testified that the time spent in connection with their jobs can easily exceed 40 hours a week. The Court considers that, although the CBA only calls for a small amount of time per week, it contains a certain implicit requirement for a larger investment of time than what the contract may call for. This is the nature of the music industry, from the smallest neighborhood band to the largest symphony orchestra.

whether to play at the scheduled concerts featuring Birmingham native Emmylou Harris, a popular folk and country singer. However, before making their decision, Handler said the Musicians heard from stagehands at the Birmingham–Jefferson Civic Center that the stagehands had been hired to tear down the stage for the Harris concert. Handler called Walker just before the midnight, January 18 deadline and again informed him the Musicians would not accept the January 9 proposal. The Symphony filed its bankruptcy petition January 19, which Handler said he learned about when a reporter from *The Birmingham News* called him for comment.

After the filing of this Chapter 11, Handler and Walker met at a local cafe, where the subject of mediation was discussed, with George McMillan suggested as a possible mediator. Handler replied that mediation was not the answer, but volunteered that the Musicians might consider a freeze for the 1993–94 season; that is, forego the snap-back provision and play the last season under the terms of 1992–93. After this meeting, John Coleman transmitted to the Musicians the first official post-petition proposal (the January 25 proposal). Debtor's Ex. 16. The January 25 proposal provided for the employment of 75 Musicians.[14] The summer season was to be eliminated and the winter season was to be shortened to 35 weeks with 210 total services required. Base pay under the January 25 proposal was dropped to $480.00 per week. Premiums for health-care coverage were limited to a Symphony contribution of $160.00 per month, and the change of carrier provision was amended to allow the Symphony to change the insurance carrier

with no obligation to select a new carrier that provides benefits comparable to the current carrier. The Symphony's supplemental contribution to the Musicians' Section 403(b) Retirement Savings Incentive Plan decreased from a maximum of $1,640.00 to a maximum of $1,148.00 per year. Debtor's Ex. 16. Handler characterized these proposals as more severe than proposals made pre-petition. The Musicians decided not to accept the January 25 proposal, and informed the Symphony that the proposal was unacceptable. Debtor's Ex. 18. The Musicians made no counterproposal, either formally or informally.

Two more letters issued from the Symphony's labor attorney indicating that the Symphony was willing to negotiate. Debtor's Ex. 19. The Musicians indicated a willingness to negotiate the January 25 proposal, but conditioned any negotiations on the Symphony's payment of salaries and reinstatement of benefits.[15] Debtor's Ex. 17. As a result, the parties were in a standoff.

Subsequent to filing its petition, the Symphony prepared a budget for the 1993–94 season, which Walker testified was based on the most current and reliable information available. Debtor's Ex. 15. Column (1) of the budget shows what the Symphony would have to expend if the snap-back provision were given effect and projects a deficit of $1,542,985.00. Column (2) of the budget reflects the January 25 proposal, and shows a surplus of $4,508.00. Artistic expenses account for 55 percent of total expenses, and have been reduced by 38.37 percent from the original budget. Other expenses have been cut significantly.[16]

14. The proposal provided for this number by reference to the CBA, which under § 2.1 calls for an orchestra of 75 members for the 1993–94 season.

15. The Symphony had not paid salaries since January 15, 1993, when the Musicians received one half a regular paycheck. Walker testified that the Symphony was completely out of money by that date.

16. For example, general expenses were reduced by 44.59 percent, marketing expenses were reduced by 21.79 percent, development expenses were reduced by 16.51 percent, and concert production expenses were reduced by 13.94 percent. Regional development was cut entirely. Other changes break down as follows:

| | Original Budget | Post–Petition Budget |
|---|---|---|
| Concert production personnel | $192,585.00 | $190,830.00 |
| Development personnel | $157,824.00 | $153,343.00 |

The Musicians were provided all the above information when they received the January 25 proposal. The financial information provided to the Musicians, Walker testified, included copies of the Symphony's bankruptcy schedules, tax statements for employees, office-space lease agreements, and other items. Handler, as a member of the finance committee and as a board member, had substantial knowledge of the Symphony's financial information. Walker testified that the revised budget and the January 25 proposal, taken together, represent an attempt to preserve institutional integrity and spread the costs of reorganization. The Musicians do not dispute the particular numbers, but merely contend that the rejection of their CBA is unfair. The Symphony, on the other hand, contends that it cannot perform the agreement as the Musicians would have it, and must reject this CBA in order to allow for effective reorganization.

## III. CONCLUSIONS OF LAW

A. *History of the Labor Act and Code Section 1113*

The Labor Act became law in 1947, and was founded on Congress' constitutional authority to regulate the flow of commerce.[17] The purpose of the Labor Act is to

prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

29 U.S.C. § 141.

The Labor Act was designed to attain labor stability through the collective bargaining process.[18] The process ultimately leads to the collective bargaining agreement, a document that is "more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.... It calls into being a new common law—the new common law of a particular industry or of a particular plant." *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 578–79, 80 S.Ct. 1347, 1350–51, 4 L.Ed.2d 1409 (1960).[19] The right to collectively bargain has become so ingrained in the American business landscape that it is to some as sacred as a freehold, and because of their importance collective

| | Original Budget | Post–Petition Budget |
|---|---|---|
| Marketing personnel | $152,330.00 | $141,292.00 |
| Finance personnel | $126,765.00 | $127,244.00 (increase) |
| Administration personnel | $112,649.00 | $110,644.00 |
| Education Personnel | $178,121.00 | $173,268.00 |
| Guest artists | $338,700.00 | $140,000.00 |

**17.** U.S. Const. art. 1, § 8, cl. 3. (Congress may "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes.") *See also, United Auto., Aircraft and Agric. Implement Workers of America v. Wisconsin Employment Relations Bd.*, 351 U.S. 266, 76 S.Ct. 794, 100 L.Ed. 1162 (1956); *New Orleans Opera Guild, Inc., v. Local 174, Musicians Mut. Protective Union*, 127 So.2d 358 (La.App.), *aff'd*, 242 La. 134, 134 So.2d 901 (1961).

**18.** The statute declares that

Experience has proved that protection by law of the right of employees to organize and .bargain collectively safeguards commerce from injury, impairment, or interruption, and promotes the flow of commerce by removing

certain recognized sources of industrial strife and unrest.

29 U.S.C. § 151.

**19.** Some have taken this notion further and declared the "relationship between workers and their employers was to be a microcosm of the larger representative democracy of American society." Albert G. Bixler, *Industrial Democracy and the Managerial Employee Exception to the National Labor Relations Act*, 133 U.Pa.L.Rev. 441 (1985). *See also*, Katherine Van Wezel Stone, *The Post–War Paradigm in American Labor Law*, 90 Yale L.J. 1509, 1514–15 (1981) (stating that the union/management relationship represents a "mini-democracy").

bargaining agreements have achieved a status loftier than a typical commercial contract.[20] A key provision in the Labor Act is the prohibition against termination or modification of the CBA without first satisfying several substantive and procedural hoops. 29 U.S.C. § 158(d). It is not surprising, therefore, that Congressional response was swift in the wake of *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984).[21]

In *Bildisco*, the Supreme Court ruled, 5–4, that a debtor in Chapter 11 could reject a collective bargaining agreement under Section 365(a), and that a rejection under Section 365 was not an unfair labor practice. Justice Rehnquist, writing for the majority, said that a collective bargaining agreement was an executory contract. 465 U.S. at 523, 104 S.Ct. at 1194. However, the Court did accept the notion that rejection of a collective bargaining agreement should be the subject of a stricter standard than that afforded other executory contracts,[22] and held that the bankruptcy courts could grant an application for rejection if 1) reasonable efforts to negotiate a voluntary modification have been made and are unlikely to produce a prompt and satisfactory solution and 2) the balancing of the equities favors rejection. *Id.* at 526–27, 104 S.Ct. at 1196–97.

As a result of *Bildisco*, organized labor "flew into a panic." [23] Within hours of the Supreme Court's decision, legislation was introduced in an effort to mitigate some of the harsh consequences of *Bildisco*.[24] Congressman Rodino introduced a bill to "clarify the circumstances under which collective bargaining agreements may be rejected." 130 Cong.Rec. H 809 (daily ed. Feb. 22, 1984). That bill would have codified the *REA Express* standard for rejection [25] and allowed rejection only if covered employees would lose their jobs and the debtor's reorganization would fail. H.R. 4908, 98th Cong., 2d Sess. at 3. The Congressman later introduced the bill that would eventually become Section 1113, H.R. 5174.

The debate over H.R. 5174 became a battle of amendments. Senator Thurmond's amendment would have adopted the *Bildisco* standard and little more beyond

---

**20.** Archibald Cox, *The Legal Nature of Collective Bargaining Agreements,* 57 Mich.L.Rev. 1 (1958); Harry Shulman, *Reason, Contract, and Law in Labor Relations,* 68 Harv.L.Rev. 999 (1955).

**21.** The tension between the Labor Act and the Code was already manifest by the time *Bildisco* was decided. Union testimony at Congressional hearings in the fall of 1983 told of management's use of bankruptcy as a method to free itself from CBA's. Rosalind Rosenberg, *Bankruptcy and the Collective Bargaining Agreement—A Brief Lesson in the Use of The Constitutional System of Checks and Balances,* 58 Am. Bankr.L.J. 293 (1984).

**22.** In essence, the Court split the baby. The Second Circuit had held that a debtor should not be able to reject a CBA unless it could demonstrate that reorganization would fail without rejection. *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2d Cir.), *cert. denied,* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975). That case held that a debtor seeking to reject a CBA must show that rejection was necessary to prevent liquidation. In *Bildisco,* the Supreme Court said that this standard was "fundamentally at odds with the policies of flexibility and equity built into Chapter 11." 465 U.S. at 525, 104 S.Ct. at 1196. On the other hand was the less restrictive "business judgment" test, which allows rejection if the rejection would be advan-

tageous to the debtor. *See, e.g., Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc.,* 756 F.2d 1043 (4th Cir.1985), *cert. denied,* 475 U.S. 1057, 106 S.Ct. 1285, 89 L.Ed.2d 592 (1986); *In re Federated Dep't Stores, Inc.,* 131 B.R. 808 (S.D.Ohio 1991); *In re Taylor,* 103 B.R. 511 (D.N.J.1989), *aff'd in part,* 913 F.2d 102 (3d Cir.1990). The Supreme Court found an appropriate middle ground in the test adopted by the Eleventh Circuit in *In re Brada–Miller Freight System, Inc.,* 702 F.2d 890 (11th Cir.1983).

**23.** Anne J. McClain, *Bankruptcy Code Section 1113 and the Simple Rejection of Collective Bargaining Agreements: Labor Loses Again,* 80 Geo. L.J. 191 (1991) (hereinafter *Labor Loses Again* ).

**24.** As fate would have it, Congress was already working on legislation designed to reorganize the Code and bankruptcy courts in the wake of the Supreme Court's decision in *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.,* 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982), in which certain aspects of the bankruptcy courts' structure were declared unconstitutional. This legislation, including *Bildisco*-inspired legislation, was enacted as the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333 (1984).

**25.** *See, supra,* n. 22.

requiring the debtor to wait 30 days before filing an application to reject. 130 Cong. Rec. S 6081–82, S 6126 (daily ed. May 21, 1984). Senator Packwood's amendment was stricter, requiring the debtor to make a proposal containing only "minimal modifications." 130 Cong.Rec. S 6181–82 (daily ed. May 22, 1984). What eventually emerged from Congress represents a compromise between the original House version and the various Senate proposals. 5 Lawrence P. King, et al, *Collier on Bankruptcy*, § 1113.01[1] (15th ed. 1993).

B. *Applicable Bankruptcy Code Section*

A debtor's application for the rejection of a collective bargaining agreement is covered by Section 1113 of the Code, which provides:

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits, or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

11 U.S.C. § 1113.

The statute raises several questions. May a debtor-in-possession unilaterally terminate a CBA post-petition without losing its right to seek an application pursuant to Section 1113, and if so how is the statute to be applied in light of the strong legislative policy favoring the workers' rights to organize and bargain collectively? Does Section 1113 contemplate a bad-faith filing? Does Section 1113 require a complete rejection of a CBA, or may the Court modify the CBA? Finally, what factors must the

Court consider in deciding whether to authorize the debtor's rejection of a CBA? This opinion will address these issues separately.

C. *Was the Symphony's Chapter 11 Filing Made in Bad–Faith?*

■ The Musicians have indicated in the evidence they presented and elsewhere [26] that they believe the Symphony filed its Chapter 11 petition in bad faith, because the only purpose it sought to serve was the rejection of the CBA. Nothing on the face of the statute indicates that a petition filed for the sole purpose of rejecting a CBA is a petition filed in bad faith. If such a rule exists, then, it must be found elsewhere.

■ The overall purpose of reorganization under Chapter 11 is to provide a financially distressed debtor a temporary respite within which to return to economic viability. *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir.1985); *In re Talladega Steaks, Inc.,* 50 B.R. 42 (Bankr.N.D.Ala. 1985). Well accepted is the notion that a debtor seeking the relief afforded by Chapter 11 must be impelled by a proper motive. *See, e.g., In re Sherwood Enter., Inc.,* 112 B.R. 165 (Bankr.S.D.Tex.1989); *In re Family Health Servs., Inc.,* 104 B.R. 279 (Bankr.C.D.Cal.1989), *rev'd on other grounds,* 143 B.R. 232 (1992); *In re Jay M. Weisman Irrevocable Children's Trust of 1981,* 62 B.R. 286 (Bankr.M.D.Fla 1986). No particular test exists for determining whether a debtor has approached the bankruptcy courts in good faith. All cases are different, and the Court must "consider any factors which evidence 'an intent to abuse the judicial process and the purposes of the reorganization provisions.'" *In re Phoenix Picadilly, Ltd.,* 849 F.2d 1393, 1394 (11th Cir.1988) (quoting *In re Albany Partners, Ltd.,* 749 F.2d 670, 674 (11th Cir.1984)).[27] Although a debtor should not

---

**26.** *See,* Elaine Witt, *ASO wants to break musicians' contract,* Birmingham Post–Herald, April 1, 1993, at A10.

**27.** The legislative history to Section 1113 appears to add a special gloss on the bad-faith issue when an application to reject a collective bargaining agreement arises. Congressman Morrison of Connecticut made the statement

that a "chapter 11 case brought for the sole purpose of repudiating or modifying a collective bargaining agreement is a case brought in 'bad faith.'" 130 Cong.Rec. H 7496 (June 29, 1984). This notion is not inconsistent with the *Phoenix Picadilly* and *Albany Partners* decisions, which imply that a sole-purpose filing can be a filing made in bad faith. Although the legislative his-

be able to use Section 1113 as a "medicine to rid [itself] of corporate indigestion,"[28] the need to reduce labor costs is of significant concern to a debtor in Chapter 11.[29] Therefore, merely desiring to restructure a relationship with a union is not necessarily indicative of bad faith.

The testimony reflects that a good deal of the Symphony's pre-petition negotiations concerned its contract with the Musicians and the sheer volume of evidence concerning meetings, proposals, and letters shows that the Symphony was very much concerned with the CBA and its potential adverse economic consequences for the Symphony. However, the evidence shows that the Symphony was not so singularly minded that it considered the rejection of the CBA the sole purpose behind its Chapter 11 petition. Although the petition was filed the day after the Musicians rejected the final pre-petition proposal, it was also filed at a time when the Symphony's cash assets were exhausted. The Symphony's financial records show that the CBA accounted for the Symphony's largest expense, and that it could not continue to pay the Musicians or operate on a balanced budget while meeting the terms of the CBA.

Finally, the Symphony was in an unenviable position regarding its fundraising. According to the testimony, community support was evaporating because people did not desire to donate money only to see no positive results. The Symphony, therefore, decided that public optimism might be restored somewhat if the organization was under the protective realm of the bankruptcy laws. While this notion may sound di-

singenuous, it is not without merit because a large portion of the Symphony's contributors consists of large corporations and their officers and directors. These people, who perhaps have more than a passing knowledge of the Code, understand that resort to the bankruptcy laws may result, in the long term, in greater financial stability as a result of the restructuring and reorganization during the breathing spell the Code permits.

Although the Court acknowledges that the CBA was a substantial issue to be faced in the Symphony's bankruptcy, the above indicates that the Symphony intended to accomplish more goals through its bankruptcy filing than merely restructuring its relationship with the Musicians. Therefore, the Court concludes that the Symphony did not file its petition in bad faith.

D. *Does the Symphony's Failure to Pay the Musicians After Filing Its Petition Result in the Loss of the Right to Pursue a Remedy Under Section 1113?*

Unquestionably, a trustee or debtor-in-possession may not unilaterally terminate or alter any provisions of a collective bargaining agreement prior to receiving court permission to do so. 11 U.S.C. § 1113(f). The Musicians filed a motion to strike the application to reject the CBA, relying on the theory that a debtor's non-payment of compensation and benefits amount to a unilateral termination or modification of the CBA. The Musicians further argued that this unilateral modifica-

tory to Section 1113 has been criticized, *see, infra,* at n. 35, the Representative's statement is construed to mean that bankruptcy filings by debtors with collective bargaining agreements must be viewed with heightened scrutiny. In the case where a solvent debtor files for bankruptcy and does nothing more thereafter than pursue an application for rejection of a collective bargaining agreement, violation of the "sole purpose" prohibition is evident, and bad faith might be found. The Symphony is not solvent, and has pursued other forms of relief since filing in this Court. *E.g.,* Motion For Entry of Order Authorizing Debtor To Enter Into Post-Petition Agreement To Transfer Trust Assets, filed March 3, 1993; Motion To Assume Unex-

pired Lease, filed March 12, 1993; Motion For Approval of Rejection of Unexpired Leases, filed April 8, 1993. Further, as will be discussed, other factors reasonably led to the Symphony's Chapter 11 petition.

**28.** *In re Century Brass Prods., Inc.,* 795 F.2d 265 (2d Cir.), *cert. denied,* 479 U.S. 949, 107 S.Ct. 433, 93 L.Ed.2d 383 (1986).

**29.** *See, e.g.,* Jeffrey W. Berkman, *Nobody Likes Rejection Unless You're A Debtor In Chapter 11: Rejection of Collective Bargaining Agreements Under 11 U.S.C. 1113,* 34 N.Y.L.Sch.L.Rev. 169 (1989).

tion or termination prevented the Symphony from proceeding with the application to reject. The Court denied the motion to strike, holding that non-payment is not a termination or modification of the CBA, although it may be a breach of contract.[30] The Musicians continue to argue that, pursuant to subsection (f), the non-payment of benefits and compensation precludes the Symphony from successfully rejecting the CBA.

 Subsection (f) has been interpreted to mean that no other provision of the Code may be used to allow a debtor to bypass the requirements of Section 1113. *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 991–92 (2d Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 50, 116 L.Ed.2d 28 (1991). In other words, a CBA cannot be rejected under Section 365, as was the case before *Bildisco*, nor could the debtor use the automatic stay provisions of Section 362 as a shield against rejection of the CBA.[31] Subsection (f) does not speak to Section 1113, but rather to other provisions of the Code. *See, Ionosphere, supra.* In effect, subsection (f) was the thread that closed any potential loophole a crafty debtor may later discover; it was not intended to preclude application of the other parts of the same section. Although subsection (f) may not have been too carefully drafted,[32] its plain

language does not support the interpretation that the Musicians prefer, that failure to pay is a violation of subsection (f) that leaves the Symphony's hands too dirty to request or be granted relief under subsection (c).[33] Subsection (c) outlines the substantive and procedural requirements of an application for rejection, and nothing indicates that failure to pay compensation and benefits is a unilateral rejection that bars an application for rejection under subsection (c).[34]

Based on the foregoing, the Court concludes that the Symphony's failure to honor the payment obligations of the CBA after the filing does not result in it being unable to pursue an application for rejection under subsection (c).

E. *Does the Application Made Under Section 1113 Require an "All–Or–Nothing" Approach?*

 The motion filed in this case was entitled "Motion To Modify, Or In The Alternative to Reject The Collective Bargaining Agreement." Thus it must be determined whether, pursuant to Section 1113, this Court can modify the terms of the CBA or whether it can merely authorize its rejection. This issue has been explored in another bankruptcy arena, which has concluded that if a court may order complete

---

**30.** *See, e.g., In re Moline Corp.*, 144 B.R. 75 (Bankr.N.D.Ill.1992).

**31.** This is the precise issue decided in *Ionosphere Clubs, supra.* According to the Second Circuit, the application of the automatic stay is precluded if it would allow a debtor unilaterally to terminate or alter a provision of a CBA. 922 F.2d at 992. The effect of this interpretation on this case is quite clear. The Musicians were not bound by the automatic stay provision of Section 362, and could have pursued remedies through the National Labor Relations Board during the pendency of the Symphony's bankruptcy.

**32.** The statute as a whole has been assailed as "inartfully drawn." Mitchell Rait, *Rejection of Collective Bargaining Agreements Under Section 1113 of the Bankruptcy Code: The Second Circuit Enters the Arena*, 63 Am.Bankr.L.J. 355, 357 (1989). The judge who conceived the widely followed test to be applied in an application to reject a CBA wrote that Section 1113 was "not a masterpiece of draftsmanship." *In re American*

*Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn. 1984).

**33.** *Bildisco* held that between the time a bankruptcy petition is filed and a CBA is formally accepted by the debtor, the CBA is not an enforceable contract. 465 U.S. at 532, 104 S.Ct. at 1199. Subsection (f) merely reverses that holding, but nothing indicates that the denial of the right to pursue an application for rejection is a weapon to be used in the post-petition enforcement of a CBA.

**34.** *Moline, supra,* and *In re Armstrong Store Fixtures Corp.*, 135 B.R. 18 (Bankr.W.D.Pa.1992) disagree on the interpretation of "unilateral termination" language of subsection (f). *Moline* holds that a debtor's failure to make payments due under a CBA is merely a breach and not a rejection, whereas *Armstrong* states that a debtor's failure to pay wages and benefits is a unilateral alteration in violation of the subsection (f). Neither, however, discuss the issue involved here and are therefore not conclusive.

rejection, then it can order partial rejection (modification). *In re Garofalo's Finer Foods, Inc.,* 117 B.R. 363 (Bankr.N.D.Ill. 1990). The court's conclusion was based on the incorporation of the requirements of Section 1113(b)(1)(A) into Section 1113(c)(1). *Id.* at 369.

> Section 1113(b)(1) expressly uses the phrase "necessary modifications" and its requirements are incorporated into section 1113(c)(1). Referencing proposed modifications in section 1113(b)(1)(A) as part of the standards incorporated by reference in subsection (c), creates the seemingly latent ambiguity concerning the form of relief available. Although the language of subsection (c) expressly references "rejection", it is not clear that rejection is the only form of relief which may be allowed or denied, given the reference to subsection (b).

*Id.*

After "discovering" this latent ambiguity in the statute, the *Garofalo* court did not resort to an inquiry into the legislative history,[35] but rather relied on the doctrine of absurd consequences, which, simply stated, is that a literal interpretation is inappropriate if it would lead to absurd results and subvert the statute's purposes.[36] Without analysis, the *Garofalo* court concluded that reading "rejection" in subsection (c) to include "modification" advances the spirit of the statute. *Id.* at 370.

This Court, however, neither finds an ambiguity in Section 1113 nor does it conclude that allowing only rejection would thwart the legislative intent of the section. Subsection (c) merely requires that, before rejection is allowed, the trustee or debtor-in-possession must make a proposal that fulfills the requirements of subsection (b)(1). Although the proposal under subsection (b)(1) must provide only for necessary modifications, nothing on the face of the statute indicates that the modification language is folded in to subsection (c), which on its face speaks only in terms of· rejection, language that, when read by this Court, is unambiguous. Disallowing modification under subsection (c) does not hinder Congressional intent, because the obvious intent of Section 1113, when viewed as a whole, is to require management and labor to first attempt a mutually acceptable resolution of their CBA dispute without court involvement. If this is accomplished, an application for rejection never becomes an issue; if, however, the parties cannot agree on a resolution and a management proposal has been rejected without good cause, then pursuant to Section 1113(c) court intervention can be sought, and the court's only authority under the statute is to allow rejection if the conditions of subsection (c) are met.

Aside from the Congressional intent to allow a bankruptcy court to authorize rejection and not modification, strong policy considerations dictate that this Court not act as an arbitrator between management and labor. This Court is not equipped to handle what would necessarily be a tedious process of rewriting the CBA. Congress has imposed upon this Court the duty to render a decision in this matter within 30 days after the commencement of the hearing. 11 U.S.C. § 1113(d)(2). If the ability to modify the CBA existed, this Court envisions that these 30 days would be filled with constant negotiations, proposals, and counter-proposals.[37] It would be inappro-

---

**35.** If a statute contains an ambiguity, a court may look to its legislative history to ascertain Congress' intent in enacting the statute. *See, e.g., West Virginia Univ. Hosps., Inc. v. Casey,* 499 U.S. 83, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991); *United States v. Rush,* 874 F.2d 1513 (11th Cir.1989). However, *Garofalo* recognizes that the legislative history to Section 1113 is of little value; it is devoid of legislative committee reports and consists merely of comments by legislators speaking for themselves and not their committees. 117 B.R. at 369. *See also, In re Mile Hi Metal Systems, Inc.,* 899 F.2d 887, 890 (10th Cir.1990) (legislative history little more than self-serving, partisan statements); Bruce H. Charnov, *The Uses and Misuses of the Legislative History of Section 1113 of the Bankruptcy Code,* 40 Syr.L.Rev. 925 (1989).

**36.** *In re Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 634, 98 S.Ct. 2053, 2056, 56 L.Ed.2d 591 (1978).

**37.** Essentially, this process would involve the adjudication of unfair labor practice issues, which the bankruptcy courts are not authorized to do. *In re Blue Diamond Coal Co.,* 131 B.R. 633, 649 (Bankr.E.D.Tenn.1991).

priate for this Court to sit at the head of a bargaining table. Further, this court does not desire to dictate the terms of a business marriage between the Symphony and the Musicians. The Court is here merely to decide whether they shall be divorced, subject to further out-of-court negotiations, and not to decide the terms under which they shall live together.

## F. *Factors Considered Under Section 1113*

■ The requirements of Section 1113 were transformed into a nine-part test in *In re American Provision Co.*, 44 B.R. 907 (Bankr.D.Minn.1984).[38] This test requires that the following be met:

1. The debtor in possession must make a proposal to the union to modify the collective bargaining agreement.
2. The proposal must be based on the most complete and reliable information available at the time it is made.
3. The proposed modifications must be necessary to permit the debtor's reorganization.
4. The proposed modifications must assure that all creditors, the debtor, and all of the affected parties are treated fairly and equitably.
5. The debtor must provide to the union such relevant information as is necessary to evaluate the proposal.
6. Between the time the proposal is made and the time the hearing on the approval of the application for rejection, the debtor must meet at reasonable times with the union.
7. At the meetings, the debtor must confer in good faith in an attempt to reach mutually satisfactory modifications of the CBA.
8. The union must have refused to accept the proposal without good cause.
9. The balance of the equities must clearly favor rejection of the CBA.

44 B.R. at 909.

The Court will consider each factor in order.

### The Debtor–In–Possession Must Make a Proposal

■ The Symphony made several proposals to the Musicians. However, the Code requires only that a debtor make *one* proposal, and that proposal must occur after the filing of the petition and before the application for rejection is made. The January 25 proposal post-dated the filing of the petition and pre-dated the filing of the application to reject by more than two months.[39] The first factor in the *American Provision* test is, therefore, satisfied.

### The Proposal Must Be Based on the Most Complete and Reliable Information

■ Walker testified that the proposal was based on all available information, and that the information was complete and reliable. The Musicians did not refute these assertions, and nothing else in the evidence shows that Walker's statements are capable of attack. Although the proposal was based on projections of revenue, nothing suggests that the projections were not

---

**38.** This test is almost universally followed in the bankruptcy courts. *See, International Union, United Auto., Aerospace and Agric. Implement Workers of America, UAW v. Gatke Corp.*, 151 B.R. 211 (N.D.Ind.1991); *In re Sun Glo Co.*, 144 B.R. 58 (Bankr.E.D.Ky.1992); *In re Valley Steel Products Co.*, 142 B.R. 337 (Bankr.E.D.Mo.1992); *In re Blue Diamond Coal Co.*, 131 B.R. 633 (Bankr.E.D.Tenn.1991); *In re GCI, Inc.*, 131 B.R. 685 (Bankr.N.D.Ind.1991); *In re Indiana Grocery Co.*, 138 B.R. 40 (Bankr.S.D.Ind.1990); *In re Express Freight Lines, Inc.*, 119 B.R. 1006 (Bankr.E.D.Wis.1990); *In re Big Sky Transp. Co.*, 104 B.R. 333 (Bankr.D.Mont.1989); *In re Sierra Steel Corp.*, 88 B.R. 337 (Bankr.D.Colo.1988); *In re Sol–Sieff Produce Co.*, 82 B.R. 787 (Bankr. W.D.Pa.1988); *In re Amherst Sparkle Mkt., Inc.*,

75 B.R. 847 (Bankr.N.D.Ohio 1987); *In re Walway Co.*, 69 B.R. 967 (Bankr.E.D.Mich.1987); *In re William P. Brogna & Co.*, 64 B.R. 390 (Bankr. E.D.Pa.1986); *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797 (Bankr.W.D.Ky.1985); *In re Wheeling–Pittsburgh Steel Corp.*, 50 B.R. 969 (Bankr. W.D.Pa.1985); *In re Cook United, Inc.*, 50 B.R. 561 (Bankr.N.D.Ohio 1985); *In re Carey Transp., Inc.*, 50 B.R. 203 (Bankr.S.D.N.Y.1985).

*But see, In re Royal Composing Room, Inc.*, 62 B.R. 403, 406 (Bankr.S.D.N.Y.1986) (rejecting the "talismanic nine-step analysis" of Section 1113).

**39.** The application to reject was filed on March 30, 1993.

grounded in reality. The second factor, therefore, is met.[40]

### The Proposed Modifications Must Be Necessary To Permit Reorganization

■ This factor is the most debated among the nine,[41] and its interpretation now exists in two divergent forms: the "absolutely essential" view espoused by the Third Circuit in *Wheeling–Pittsburgh Steel Corp. v. United Steelworkers of America, AFL–CIO–CLC,* 791 F.2d 1074 (3d Cir.1986) and the "necessary, but not absolutely minimal" view formulated by the Second Circuit in *Truck Drivers Local 807, International Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Carey Transportation, Inc.,* 816 F.2d 82 (2d Cir.1987).

In *Wheeling–Pittsburgh,* the Third Circuit tracked the legislative history at length and concluded that the "congressional consensus that the 'necessary' language was substantially the same as the phrasing in Senator Packwood's amendment." 791 F.2d at 1088. The Packwood amendment required that the debtor's proposal contain only the "minimum modifications ... that would permit the reorganization." 791 F.2d at 1087) (citing 130 Cong. Rec. S 6181–82 (daily ed. May 22, 1984)).[42] The Third Circuit then discussed whether the modifications were intended to foster the debtor's ability to reorganize for the long-term, or whether they were to be only those that allowed the debtor to avoid liquidation.

> While we do not suggest that the general long-term viability of the Company is not a goal of the debtor's reorganization, it appears from the legislators' remarks that they placed the emphasis on determining whether and what modifications should be made to a negotiated collective bargaining agreement on the somewhat shorter term goal of preventing the debtor's liquidation.

791 F.2d at 1089.

Therefore, the court determined that a stricter standard should be applied to "necessary modifications" in an application to reject a collective bargaining agreement.

The Second Circuit, on the other hand, takes the view that the Third Circuit's approach is more appropriate in a proceeding to implement interim changes under Section 1113(e). 816 F.2d at 89. At the stage where the court is considering rejection, however, the proper focus is on "whether the rejection would increase the likelihood of successful reorganization." *Id.* In addressing the Packwood-amendment issue, the Second Circuit noted that Congress did not adopt the proposal, and instead compromised. *Id.* This indicated that Congress was "uncomfortable with language suggesting that a debtor must prove that its initial post-petition proposal contained only bare-minimum changes." *Id.* "Necessary," therefore, does not equate with "essential."

---

**40.** Analysis of the second and other factors of the *American Provision* test has been criticized. *Labor Loses Again, supra,* n. 23, at 199. That commentator noted that

> [r]ather than force a debtor to meet its burden of proof, courts have merely required a debtor to come forward with the information. .... The union is then forced to produce evidence that the information ... was not the relevant information needed to evaluate the debtor's proposal. This is a steep burden for the union, which does not have access to, nor familiarity with, the company's records and would not know what better information might be available.

*Id.* (citations omitted).

This case, however, is quite different than the one the author was apparently contemplating, because the Musicians had a representative on the Symphony's board of directors and its finance committee. Therefore, the burden to refute the Symphony's financial information is not steep, but is within ready grasp of the Musicians.

**41.** *See generally, Labor Loses Again, supra,* n. 23; Judith D. Nichols, *Rejection of Collective Bargaining Agreements by Chapter 11 Debtors: The Necessity Requirement Under Section 1113,* 21 Ga.L.Rev. 967 (1987).

**42.** This was consistent, the Third Circuit indicated, with the purpose behind Section 1113, which was to overturn the lenient *Bildisco* standard and reinstate the *REA Express* standard. 791 F.2d at 1088.

Under the Second Circuit's test, the necessity requirement puts the burden on the debtor to make a proposal in good faith that includes necessary changes that will enhance the debtor's ability to successfully reorganize. *Id.* at 90.

This Court is of the opinion that, under either the *Wheeling–Pittsburgh* standard or the *Carey Transportation* standard, the Symphony has satisfied its burden under the third factor of the *American Provision* test. The January 25 proposal allows the Symphony to barely break even, while the alternative would be to sink $1.5 million deeper. Even if the Symphony were not required to maintain a balanced budget, this Court could not countenance a proposal that would result in the loss of any more funds. The balanced-budget requirement, however, only makes the Symphony's proposal that much more palatable. Although it is true that the Symphony could cut all expenses before proposing changes in the CBA, nothing requires that a business curtail all other expenses before seeking concessions from a union.

Additionally, the evidence was clear and uncontroverted that the Symphony meets the stricter, *Wheeling–Pittsburgh* test, because without the proposed modifications, liquidation is inevitable. The Musicians offered no evidence to support a claim that liquidation could be avoided with only minor changes to the CBA.

Finally, the proposed modifications did not wreak utter and total havoc on the CBA.[43] Although the proposals touched the "bread-and-butter" issues of wages and benefits, many more elements of the CBA went untouched. Many parts of the CBA require the Symphony to spend money for the Musicians' comfort and convenience, but nothing proposed would force the Musicians to play under adverse circumstances merely so the Symphony could save money.

The Court, based on the foregoing, concludes that the Symphony has fulfilled the requirement that it propose only necessary modifications to the CBA.

*The Proposed Modifications Must Assure That All Parties Are Treated Fairly and Equitably*

Inquiry into this factor should focus on whether the proposal burdens the union employees disproportionately in relation to non-union employees[44] and the Court should determine whether the union employees bear the entire or disproportionate share of the sacrifices that will make the debtor's reorganization work. *Wheeling–Pittsburgh, supra,* at 1091 (quoting the remarks of Congressman Morrison, 130 Cong.Rec. H 7496 (daily ed. June 29, 1984)). This requirement, the Court believes, does not mean that the non-union employees and the union employees must take pay reductions in equal percentages. Even *Wheeling–Pittsburgh* questioned this approach.[45] One of the major impediments to following such a course is the requirement that the Court look to how "all of the affected parties" are treated. *American Provision,* 44 B.R. at 909; 11 U.S.C. § 1113(b)(1)(A). The affected parties in this case include those who have intangible interests, such as the city, the state, and the season-ticket holders. Although the latter group is currently queuing for a distribution to creditors, their real interest is in hearing the Musicians play again. The proposal directly affects that interest by reducing the number of weeks in the Symphony's season, so they, too, bear some of the burden of the Symphony's proposal. Other interests shall be discussed in more detail under the "balance of the equities" portion later in this opinion.

The Court has previously outlined the reductions in personnel under the income

---

**43.** Under the *Wheeling–Pittsburgh* approach, proposed CBA modifications that had no direct impact on labor costs have failed to satisfy the standard. *In re William P. Brogna and Co.,* 64 B.R. 390 (Bankr.E.D.Pa.1986).

**44.** *See, e.g.,* Janell M. Kurtz, et al, *Rejection of Collective Bargaining Agreements in Bankruptcy:*

*A Review, Update, and Guide for Debtors,* 96 Com.L.J. 31 (1991).

**45.** "We cannot accept *ipso facto* the commentators' suggestions that such matters are capable of comparison by percentages or in dollars." 791 F.2d at 1092.

and expense statement accompanying the January 25 proposal.[46] These reductions show that the Musicians do not bear the entire costs of salary cutbacks. Also indicated by the income and expense statement is the elimination of the Symphony's budget for Regional Development, along with other significant cuts in non-personnel expenses in other areas.[47] These cuts indicate a willingness on the Symphony's part to shoulder some of the burden, and while these cuts may not amount to a dollar-for-dollar reduction with the Musicians, the Court cannot say that the two sides are sharing the burden disproportionately. The Court also suggests that changes not proposed in the CBA, discussed in the foregoing section, show that the Symphony's proposal attempted to ease the burden on the Musicians as much as possible. Walker also testified that some Symphony departments had cut back personnel, and that remaining personnel were performing extra duties without commensurate increases in pay. The Court concludes, based on the foregoing, that the Symphony has shown that its has met the requirement of the fourth factor of the *American Provision* test.

### The Debtor Must Provide Relevant, Necessary Information to the Union

■ Walker testified that the Symphony provided the Musicians with all available information, and no rebuttable to this assertion was offered. Although the Musicians were not provided with information and projections accumulated and made by an outside source,[48] no one has questioned Walker's ability to prepare an accurate budget. Also, as previously mentioned, Handler was on the board of directors of the Symphony and never alleged that he

was denied access to available information. Therefore, the Symphony has satisfied this part of the test.

### The Debtor Must Meet With the Union at Reasonable Times

■ This requirement poses an interesting question: What happens if the union refuses to meet with the debtor? Should the debtor be penalized by taking away its ability to pursue relief under Section 1113 merely because the union refuses to meet? Certainly, that is not equitable. The Symphony, however, expressed what appears to be an honest desire to meet with the Musicians when it transmitted the January 25 proposal. The Musicians responded to this invitation to negotiate by refusing to meet until the Symphony complied with the payment terms of the existing contract. The Code merely requires that the purposes of the Labor Act be maintained to some degree, and one of the purposes of the Labor Act is to allow parties to negotiate freely without interference. However, an employer cannot break down the union hall doors and force a negotiation meeting; the parties must come together voluntarily. If one side will and the other will not, the willing party should not suffer adverse consequences because of the other party's unwillingness. Therefore, this Court will not punish the Symphony because it has not met with the Musicians.

### The Debtor Must Confer in Good Faith

■ Again, the same problem arises: If no meeting is held, how can the debtor confer in good faith? The good faith requirement under Section 1113 has been interpreted to mean that the debtor must have made a serious effort to negotiate. *In re Kentucky Truck Sales, Inc.*, 52 B.R. 797 (Bankr.W.D.Ky.1985).[49] In *American*

**46.** N. 16, *supra.*

**47.** Guest artist expenses under the original 1993–94 budget, for example, were set at $338,-700.00, but reduced to $140,000.00 under the January 25 budget. Recording costs and artistic production were eliminated, saving $9,000.00. Administration expenses were reduced from $126,493.00 to $116,981.00, and general expenses were reduced from $185,445.00 to $102,-

747.00. Other cuts were also made. *Compare* Debtor's Ex. 14, col. 2 *with* Debtor's Ex. 15, col. 2.

**48.** *See, In re K & B Mounting, Inc.,* 50 B.R. 460, 467 (Bankr.N.D.Ind.1985).

**49.** Some courts have likened the good-faith requirement to a similar requirement under the Labor Act. *In re Mile High Metal Systems, Inc.,*

*Provision,* the debtor was found not to have negotiated in good faith based on its failure to follow through on the union's offer to negotiate.[50] This left the court with "the impression that the debtor's attempts to confer were perfunctory only and meant only to literally meet the requirements of the statute." 44 B.R. at 911. Using this as a yardstick by which the Symphony's conduct may be measured, this Court finds that the Symphony's letter of January 26 exhibited more than a perfunctory attempt to meet the terms of Section 1113. The transmittal letter explicitly stated that the Symphony was willing to "bargain" over the terms of the proposal at the Musicians' earliest convenience. Debtor's Ex. 16. The use of the term "bargain" indicates that the Symphony was not putting a "take-it-or-leave-it" proposal on the table, but was sincere about its efforts to plow some middle ground before resorting to the measures allowed by Section 1113. "Bargain" is not merely a magic term employed to satisfy the conditions of the statute; it shows the Symphony knew the Musicians had rights that had to be protected and was willing to consider those rights within the context of a bankruptcy reorganization.

A debtor's failure to obtain a meeting with a union has been held not to preclude a finding of good faith. *In re Texas Sheet Metals, Inc.,* 90 B.R. 260 (Bankr.S.D.Tex. 1988). In that case, the debtor was attempting to meet with two unions, one of which never contacted the debtor indicating a desire to negotiate. 90 B.R. at 270. The union, the court said, could not "complain of the debtor's failure to make a subse-

quent proposal," and found that the debtor bargained in good faith with both unions. *Id.* at 271. *Texas Sheet Metals* is particularly instructive when applied to the facts of this case, and this Court concludes that the Symphony has met its statutory requirement to bargain in good faith, even though no post-petition meeting occurred.

### The Union Must Have Rejected the Proposal Without Good Cause

 "Without good cause" is not synonymous with "in bad faith." *In re Salt Creek Freightways,* 47 B.R. 835 (Bankr.D.Wyo.1985). Instead, "without good cause" must be reviewed by an objective standard that accounts for the purposes of Chapter 11. *Id.* In essence, this means that the union must indicate a willingness to work with the debtor in its attempts to reorganize.[51] In this case, the Musicians have not indicated a desire to negotiate toward a meaningful reorganization. They have merely insisted that the Symphony comply with the payment terms of the CBA before negotiations commence. This is an unreasonable position, because the Musicians knew that the Symphony did not have the funds to pay them. The Musicians could have commenced negotiations, and during those sessions could have bargained on the Symphony's pre-proposal conduct in relation to wages and benefits. They chose, however, not to do so, and the Court concludes that they did so without good cause.

### The Balance of the Equities Must Clearly Favor Rejection

 The final element of the *American Provision* test is generally regarded as

---

899 F.2d 887 (10th Cir.1990). However, the legislative history of Section 1113 does not suggest that principles of labor law are implicit in Section 1113. Therefore, the proper focus is on the debtor's conduct.

**50.** The debtor had only one meeting with the union, and its proposal made at that meeting was ultimately rejected. 44 B.R. at 911. However, the union expressed a desire to meet later, but the debtor never lent itself to further discussions.

**51.** *See, e.g., In re Indiana Grocery Co.,* 138 B.R. 40 (Bankr.S.D.Ind.1990). In *Indiana Grocery* the union rejected the debtor's proposal because

it felt that, even with the proposed modifications, the debtor would ultimately find itself in liquidation. The union, therefore, wanted to protect whatever claims it had against the debtor. This, the court said, was a "purely selfish concern [and] cannot be good cause for refusing to cooperate with the debtor's good faith efforts to reorganize." *Id.* at 50. *See also, Carey Transportation, supra,* wherein the court said that the union's "pre-hearing stonewalling" meant that it could not later claim that it had good cause for rejecting the debtor's proposal. 816 F.2d at 92.

similar to the *Bildisco* standard for balancing the equities,[52] which required the bankruptcy court to

> consider the likelihood and consequences of liquidation for the debtor absent rejection, the reduced value of the creditors' claims that would follow from affirmance [of the CBA] and the hardship that would impose on them, and the impact of rejection on the employees. In striking the balance, the Bankruptcy Court must consider not only the degree of hardship faced by each party, but also any qualitative differences between the types of hardship each may face.

465 U.S. at 527, 104 S.Ct. at 1196–1197.

The Symphony's liquidation is almost certain if this Court does not approve the rejection of the CBA; the testimony was clear and convincing on this point and went unrefuted. The Symphony sees no way possible to survive if it must continue to meet the terms of the CBA, and the cold and candid numbers bear this out. The consequences of liquidation are obvious: the Symphony will be defunct, the Musicians will have no employer, and the city and state will have a vacant lot on their artistic landscape. The Symphony has few hard unencumbered assets that can be reduced to dollars, so the Symphony's creditors, which include not only trade creditors but season-ticket holders, shall be left with nothing. Trade creditors may easily find new customers, but the season-ticket holders, and anyone who wishes to enjoy symphonic music, will have nowhere to turn. The Symphony is the only source in this city or this state for the service it provides. Liquidation will convert the Musicians to creditors, so their interests, too, shall be unprotected.

A balancing of the equities in this case must also take into account the not-for-profit nature of the Symphony. This is not a case of management seeking to grow richer at the expense of a union. No evidence suggests that management will gain financially from concessions by the Musi-

cians, which surely was a purpose for ensuring the enforceability of most CBA's.

The degree of hardship in a case such as this is hard to define, as is the qualitative difference between the hardships. Essentially, though, the hardship the Musicians will face under either scenario, reorganization or liquidation, can rightfully be considered the key factor in determining how the scales of equity are tipped. Under reorganization, the Musicians have the possibility of a future with the Symphony. Although the future may not be as prosperous as the Musicians may have hoped, it will at least exist. The same cannot be said for their prospects under liquidation. If the CBA is rejected the Symphony may be on stronger financial ground, and the Musicians will reap the benefits. Until that time, it can only be hoped that the Symphony and Musicians can work together for their mutual benefit.

## IV. CONCLUSION

For the foregoing reasons, the Symphony is entitled to have its application to reject the collective bargaining agreement with the Musicians granted. An appropriate order shall be entered.

---

52. *See, e.g., Century Brass, supra,* at 273; *Salt Creek Freightways, supra,* at 841; *International Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of America v. IML Freight, Inc.,* 789 F.2d 1460 (10th Cir.1986).